Argued and submitted March 4, modified December 16, 1980

SPRINGFIELD EDUCATION ASSOCIATION,
*Petitioner,*

*v.*

SPRINGFIELD SCHOOL DISTRICT NO. 19, et al,
*Respondents,*
*and*

SCHOOL DISTRICT NO. 1, MULTNOMAH
COUNTY, et al,
*Intervenors.*

(ERB No. C-278)

EUGENE EDUCATION ASSOCIATION,
*Petitioner,*

*v.*

EUGENE SCHOOL DISTRICT NO. 4J, et al,
*Respondents,*
*and*

SCHOOL DISTRICT NO. 1, MULTNOMAH
COUNTY, et al,
*Intervenors.*

(ERB No. C-279)

SOUTH LANE EDUCATION ASSOCIATION,
*Petitioner,*

*v.*

SOUTH LANE SCHOOL DISTRICT NO. 45J3, et al,
*Respondents,*
*and*

SCHOOL DISTRICT NO. 1, MULTNOMAH
COUNTY, et al,
*Intervenors.*

(ERB No. C-280)

(CA 12102, SC 26542)

621 P2d 547

218-b 

Jennifer Friesen and Henry H. Drummonds argued the cause for petitioners. With them on the petition was Kulongoski, Heid, Durham & Drummonds, Eugene. On the briefs was Henry H. Drummonds of Kulongoski, Heid, Durham & Drummonds, Eugene.

Bruce E. Smith, Eugene, argued the cause for respondent school districts. With him on the briefs were Moore, Wurtz & Logan, Springfield; Gary R. Ackley of Ackley & Kelsay, Cottage Grove; Young, Horn, Cass & Scott, Eugene; and Richard E. Miller of Hershner, Hunter, Miller, Moulton & Andrews, Eugene.

Mark C. McClanahan, Portland, argued the cause for Intevenors. With him on respondent school districts' briefs were Edward C. Harms, Jr., of Harms & Harold, Springfield; and Miller, Anderson, Nash, Yerke & Wiener, Portland, attorneys for intervenors.

James A. Redden, Attorney General, and Al J. Laue, Assistant Attorney General, Salem, waived appearance for respondent Employment Relations Board.

Before Denecke, Chief Justice, and Tongue, Howell,** Lent, Peterson, and Tanzer, Justices.

TANZER, J.

---

**Howell, J., retired November 30, 1980.

## TANZER, J.

These three consolidated contested cases originated six years ago in unfair labor practices complaints against three school districts filed with the Employment Relations Board (ERB) by complainants, three teachers' labor organizations. The complaints charged the school districts with unfair labor practices by refusal to bargain regarding some 92 proposals, including proposals regarding teacher evaluation. There have been two ERB orders and three Court of Appeals' opinions. The latest Court of Appeals' decision upheld an ERB order which required mandatory collective bargaining regarding certain aspects of the evaluation proposals and permissive collective bargaining as to others. The ultimate issue is whether teacher evaluation is a "condition of employment" under ORS 243.650(4) and therefore subject to mandatory bargaining.[1] The threshold issue is whether the meaning of the statutory phrase "condition of employment" is to be determined by the agency or by the court. That issue has dominated the most recent appeal and we allowed review in order to consider it.

### HISTORY OF THE CASE

The first ERB order classified some proposals as mandatorily and others as permissively negotiable. The Court of Appeals held in its first opinion that "ERB's conclusion that matters which to a large extent involve questions of educational policy are not mandatory subjects for bargaining is not unlawful in substance.[2] *Springfield Ed. Assn v. Sch. Dist.,* 24 Or App 751, 759, 547 P2d 647 (1976). Applying that principle, it affirmed the order in part. ERB had concluded that certain student teacher contracts were not a subject of permissive negotiation. The Court of Appeals, balancing the effect on teachers' employment and upon educational policy, concluded that the contracts were subjects for permissive bargaining and reversed that portion of the ERB order. 24 Or App at 760.

---

[1] Since these proceedings began, the legislature has enacted ORS 342.850 which regulates teacher evaluation. It is not applicable to this contract year or this proceeding.

[2] The order had defined "educational policy" for this purpose as equivalent to "management prerogative" and "proprietary functions" as those terms are used in the private sector.

Upon reconsideration, the Court of Appeals concluded, on the basis of its intervening opinion in *Sutherlin Ed. Assn v. Sch. Dist.,* 25 Or App 85, 548 P2d 204 (1976), that it had erred by itself weighing the effect on employment and educational policy because that application of the statute to the facts was properly a function of ERB, not of the Court of Appeals. *Springfield Ed. Assn v. Sch. Dist.,* 25 Or App 407, 410, 549 P2d 1141 (1976). The case was remanded to allow ERB to apply the legal test which had been formulated by the Court of Appeals.

On remand, ERB applied the Court of Appeals' formulation to the evaluation proposals. In summary, the Board classified the evaluation proposals into three component parts: the bases and use of evaluation, the mechanics of evaluation, and the minimum fairness procedures for evaluation. It found that the first two categories, bases and mechanics, were subjects of permissive bargaining because their relation to educational policy outweighed their impact on the teacher's employment. It held that the third category, fairness procedures, was a subject of mandatory bargaining because the effect on the teacher's employment outweighed the effect on educational policy. It surveyed the proposals, phrase by phrase, and classed each within one of the three categories.

On review, the Court of Appeals found error but upheld the order. It reasoned that under the opinion of this court in *McPherson v. Employment Division,* 285 Or 541, 591 P2d 1381 (1979), the construction of the statutory term "other conditions of employment" was within the authority of the agency, not the court. Therefore, it concluded, ERB erred in applying the Court of Appeals' construction of the statute rather than formulating and applying its own. It nevertheless upheld the order on the basis of ERB's counsel's representation that the members of the Board, had they had the benefit of the *McPherson* opinion and known that they could make their own interpretation, would have chosen to adopt and apply the test formulated by the Court of Appeals as their own. The Court of Appeals concluded that a remand would be pointless and upheld the order. We agree that a remand for an order amended in that respect would needlessly extend this already protracted proceeding.

We allowed the labor organizations' petition for review to determine whether the rule in *McPherson* had been correctly applied to this case; *i.e.,* whether the construction of the statutory phrase "other conditions of employment" was properly an administrative or a judicial responsibility and, either way, whether the construction in this case was lawful.

## AUTHORITY TO CONSTRUE STATUTE

Allocation between agencies and courts of responsibility for giving specific meaning to statutory terms presents a problem of long standing. As might be expected with a problem so elusive, this court has historically followed several approaches and invoked various familiar phrases. The results are fairly harmonious, but neither the phrases used nor the theories relied upon are consistent.

One prominent line of cases reviews agency action, whether by rule or order, by recognizing that the legislature gave to the agency, not to the court, authority to fill in the so-called "interstices" of the statutes they are required to administer. *See, e.g., Ore. Newspaper Pub. v. Peterson,* 244 Or 116, 415 P2d 21 (1966); *U. of O. Co-Oper. v. Dept. of Rev.,* 273 Or 539, 542 P2d 900 (1975). A parallel line of cases, however, holds that it is the responsibility of the courts to construe such statutes, and the interpretation by the agency will merely be given some degree of respect. *See, e.g.,* "great weight," *City of Portland v. Duntley,* 185 Or 365, 203 P2d 640 (1949) and *Curly's Dairy v. Dept. of Agriculture,* 244 Or 15, 415 P2d 740 (1966); "careful consideration," *Gouge v. David,* 185 Or 437, 454, 202 P2d 489 (1949).[3] Some cases hold both ways. In our oft cited case of *Van Ripper v. Liquor Cont. Com.,* 228 Or 581, 365 P2d 109 (1961), we said initially that the legislature conferred authority upon the agency to "fill in the interstices in the legislation," 228 Or at 581, but concluded that agency

---

[3] *See also,* "we tend to defer," *Fairview Hospital v. Moore,* 28 Or App 637, 640, 560 P2d 671 (1977); "usually accord considerable weight," *Smith v. Peet,* 29 Or App 625, 564 P2d 1083 (1977); "due deference," *Duncan v. Law Enforcement Council,* 37 Or App 119, 123, 586 P2d 398 (1978).

interpretation would only be "generally given careful consideration by the courts," 228 Or at 593.[4]

Another line of cases categorizes agency determinations as fact or law, holding that fact determinations are for agencies and law is for courts. Professor Davis has demonstrated that courts generally have inconsistently assumed interpretive responsibility as a matter of discretion and have justified the results by manipulation of the fact-law distinction. Davis, Treatise on Administrative Law, § 30.08. In *Baker v. Cameron,* 240 Or 354, 401 P2d 691 (1965), this court, recognizing Davis' criticism, resolved to sort out law and facts. We held that once the historical facts are found, the question of whether those facts come within the meaning of a statute is one of law for the court. Because the agency presumably has "some expertise," an agency determination "should be given some consideration" by the courts. 240 Or at 359-360. Thus the court assigned to itself the ultimate authority to determine what constitutes "employment" as that word is used in the Unemployment Compensation Act. Later, in *Kirkpatrick v. Peet,* 247 Or 204, 428 P2d 405 (1967), we held that application of the term "employer" in the same act was a task of law for the court.

Most recently, in the context of review of rulemaking authority, we concluded in *Morgan v. Stimson Lumber Company,* 288 Or 595, 607 P2d 150 (1980), that the difference in our cases was not produced by the general phrases employed in various opinions. Rather, the results vary according to the nature and scope of the authority delegated by the statutes:

[4] Although this court took three pages to make the theoretical shift in *Van Ripper,* the Court of Appeals, in its concise manner, has followed both the *deference* and *interstitial* approaches in one sentence:

"We note preliminarily that an agency's interpretation of its statutory authority is entitled to deference by the courts and we cannot substitute our policy ideas for those of the agency." *Miller v. OLCC,* 42 Or App 555, 561, 600 P2d 954 (1979).

Oregon is not alone in this inconsistency. Professor Davis points out that the United States Supreme Court has failed, apparently consciously, to resolve its two inconsistent lines of cases. In one, it reviews agency construction for rightness; in the other, for reasonableness. Davis, Treatise on Administrative Law 311-313, § 30.00 (1980 Supplement).

"* * * In short, different holdings on the validity of agency rules, * * * do not result from different generalizations about agency rulemaking but from scrutiny of the scope of the responsibilities for substantive policy and for its administration that are assigned to the agency under the particular law at issue." 288 Or at 602.

*See also* Jaffe, Judicial Control of Administrative Action 572 (1965). Consistent with that observation, our most recent opinions look to the words of the statutes to determine the nature and scope of authority which they convey to the agency. Both *McPherson v. Employment Div., supra,* and *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980), involved review of orders in contested cases, but the latter discussed the need for rules in certain situations. Although the context, and hence some of the language, was somewhat different, the conceptualization in both cases was essentially the same and the analyses consistent.

In *McPherson* and in *Megdal* we described three classes of statutory terms, each of which conveys a different responsibility for the agency in its initial application of the statute and for the court on review of that application. They may be summarized as follows:

1.) Terms of precise meaning, whether of common or technical parlance, requiring only factfinding by the agency and judicial review for substantial evidence;

2.) Inexact terms which require agency interpretation and judicial review for consistency with legislative policy; and

3.) Terms of delegation which require legislative policy determination by the agency and judicial review of whether that policy is within the delegation.

It is the initial purpose of this opinion to elaborate on that categorization so as to clarify the respective responsibilities of administrative agencies and courts.

### 1. Exact Terms

The first class is of statutory terms which impart relatively precise meaning, e.g., 21 years of age, male, 30 days, Class II farmland, rodent, Marion County. Their

applicability in any particular case depends upon agency factfinding. Judicial review of an administrative order applying such a term would normally be for substantial evidence under 183.482(8)(c) which provides:

> "The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record."[5]

### 2. Inexact Terms

■ The second class is of terms which are less precise. Whether certain things are included will depend upon what the user intended to communicate or accomplish by the use of the word. To determine the intended meaning of inexact statutory terms, in cases where their applicability may be questionable, courts tend to look to extrinsic indicators such as the context of the statutory term, legislative history, a cornucopia of rules of construction, and their own intuitive sense of the meaning which legislators probably intended to communicate by use of the particular word or phrase. In any event, however, the inquiry remains the same: what did the legislature intend by using the term.

■■ In *McPherson* we characterized such statutory terms as embodying complete expressions of legislative meaning, even though that meaning may not always be obvious. When applying such statutory terms to specific facts, whether by order or by rule, the task of the agency, and ultimately of the court, is to determine whether the legislature intended the compass of the words to include those facts. The determination of the meaning of a statute is one of law, ultimately for the court.

A later case construing the Unemployment Compensation Act illustrates our post-*McPherson* analytical approach as it applies to the second class of terms. The result in *Taylor v. Employment Division,* 286 Or 711, 597 P2d 780 (1979), was the same as that in *Baker v. Cameron*

---

[5] This is the present version of the statute. Although it was in different form when this proceeding commenced, the 1979 amendment, 1979 Or Laws ch 593, sec 24, was intended primarily to clarify rather than modify the nature and scope of judicial review. This is equally true of subsection (8) in its entirety, other parts of which are set out below. See Frohnmayer, Oregon Administrative Procedures Act Reform, Or St Bar CLE Administrative Law and Local Government 11 (1979).

and *Kirkpatrick v. Peet, supra,* but the rationale was different. We followed the analytical framework developed in *McPherson.* Because ORS 657.100 purports to fully define the term "unemployment" and because that term has a relatively settled meaning historically, we inferred that the legislature had completely expressed its meaning as to what facts were to be covered by that word of the Act. Because the definition was intended to be complete, there was no latitude for the agency to make its own legislative or policy decisions as to the coverage of the statute because there were none left to make. Rather, the statute allowed only one interpretation as it applied to the facts of the case. The initial task of the agency and our ultimate task were merely to discern and apply the legislature's intended meaning. The question of whether the facts came within the statutory meaning was therefore held to be a legal question for the court and the agency determination was reversed.

■ In saying that the legislature has completely stated its meaning and that the court ultimately discerns and applies that meaning as a matter of law, we recognize that imprecise terms in this second class are capable of contradictory applications, all of which are within the dictionary meanings of the term. We refer to the legislature having expressed itself not in the semantic sense, but rather in the sense of having made a complete policy statement. Whether any possible meaning comes within the intended meaning depends upon the policy which the word or phrase is intended to convey. Thus, when we refer to a term representing a complete legislative expression, we refer to a completed legislative policy judgment having been made.

Whether certain facts are within the intended meaning depends upon the policy that inheres in the term by its use in a statute which is intended to accomplish certain legislative purposes. For example, whether a contract log hauler is an employee under the Workers' Compensation Act, see *Woody v. Waibel,* 276 Or 189, 554 P2d 492 (1976) or whether a freight hauler is an employee under the Unemployment Compensation Act, see *Mitchell Bros. v. Emp. Div.,* 284 Or 449, 587 P2d 475 (1978) and *Byrne Trucking, Inc. v. Emp. Div.,* 284 Or 443, 587 P2d 473

(1978), depends upon the particular purposes of the respective statutes. Similarly, whether commission salesmen are employees for purposes of the Unemployment Compensation Act, see *Baker v. Cameron, supra,* and *Kirkpatrick v. Peet, supra,* and whether newsboys are employees under the National Labor Relations Act, *see NLRB v. Hearst,* 322 US 111, 64 S Ct 851, 88 LEd 1170 (1944), may depend upon the different legislative purposes of those respective statutes. Where the applicability of the term is not certain, its meaning is not a question of lexigraphy, but rather a question of the policy which is incorporated in the legislative choice of that word. The processes of administrative application of such terms and judicial review must be performed to effectuate the complete legislative policy judgment which such terms represent.

When applying terms of complete legislative expression, it is the function of the agency to determine initially which decision is within the legislative policy, e.g. whether it is within the legislative purpose to consider a certain type of worker an employee under the particular statute. In some cases, legislative history will reveal that certain situations were expressly considered and intended to be included or excluded. More often, however, the test is general: whether a particular interpretation or application is consistent with or tends to advance a more generally expressed legislative policy.

■ ■ An agency may express its determination of which interpretation effectuates the statutory policy either by rule or, as here, by order in a contested case. ORS 183.470 requires that orders contain findings of fact and conclusions of law:

"(1) Every order adverse to a party to the proceeding shall be in writing or stated in the record and may be accompanied by an opinion.

"(2) A final order shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the underlying facts supporting the findings as to each contested issue of fact and as to each ultimate fact required to support the agency's order.

"* * * * *."

A statute is interpreted in deed by orders or agencies which apply statutes to particular facts. The requirement of ORS 183.470 that the order contain findings of fact and conclusions of law is a requirement that the reasoning by which the agency applies a statute to facts to reach a result be expressed in the order. If the statute is plain on its face, the reason is obvious and may be expressed by a simple statutory reference. If the statute requires interpretation, however, the interpretation and the agency's rationalization of it are properly a part of the reasoning of the order. Thus, under ORS 183.470, the order itself is the instrument by which an agency demonstrates that a particular interpretation or application of a statute is within a generally expressed legislative policy.

One effect of the 1979 amendments to the APA at the decisional stage is to require the agency to analyze its decision in statutory terms. As some knowledgeable commentators have put it, a purpose was to emphasize to administrative agencies

"* * * the need to articulate the bases of arguments and of decisions on review. [I]t alerts the agency to the necessity of dealing clearly with the disputed issues. Isolation and identification of the elements in dispute should help both the agency and the court act in a more consistent manner." Brodie and Linde, State Court Review of Administrative Action, 1977 Ariz St LJ 537, 559.

■ Judicial review of administrative application of such a term in an order is a review for error of law under ORS 183.482(8)(a) which provides:

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:"

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

■ The dispositive question of law on review, under this section, is whether the agency action is within the legislative policy which inheres in the statutory term. An agency interpretation may be given an appropriate degree of assumptive validity if the agency was involved in the legislative process or if we infer that it has expertise based

upon qualifications of its personnel or because of its experience in the application of the statute to varying facts. Judicial deference, however, is not automatic or unreasoning. If a statute must be interpreted to determine its applicability to the facts of a contested case, then, it is necessary for the agency to express in its order, to the degree appropriate to the magnitude or complexity of the contested case, its reasoning demonstrating the tendency of the order to advance the policy embodied in the words of the statute. Explicit reasoning will enable the court on judicial review to give an appropriate degree of credence to the agency interpretation. *Dickinson v. Davis,* 277 Or 665, 561 P2d 1019 (1977); see also *Home Plate, Inc. v. OLCC,* 20 Or App 188, 190, 530 P2d 862 (1975). This was referred to in *McCann v. OLCC,,* 27 Or App 487, 495, 556 P2d 973 (1976) as a review for "substantial reason." If the agency interpretation is embodied in a rule, and the rule is otherwise lawful, the rule will be upheld on judicial review of either the rule or any order based upon the rule, if the interpretation can be determined to be within the statutory intent, but not otherwise. ORS 183.400(4)(b), *U. of O. Co-oper. v. Dept. of Rev., supra.* The issue of law on review is whether the agency interpretation coincides with the legislative policy which inheres in the meaning of the statute.

### 3. Delegative Terms

The third class of statutory terms described in *McPherson* and *Megdal* express non-completed legislation which the agency is given delegated authority to complete. The legislature may use general delegative terms because it cannot foresee all the situations to which the legislation is to be applied and deems it operationally preferable to give to an agency the authority, responsibility and discretion for refining and executing generally expressed legislative policy. This pattern of general legislation and specific application arises in several contexts. In *McPherson,* we dealt with a statutory term, "good cause," which "calls for completing a value judgment that the legislature itself has only indicated." As other examples, we cited "fair," "unfair," "undue," "unreasonable," or "public convenience and necessity." 285 Or 550. The task of the agency administering such a statute is to complete the general policy decision

by specifically applying it at retail to various individual fact situations. *Cf. Dickinson v. Davis, supra* at 673.

Complainants contend that the *McPherson* concept is limited to terms of value judgment. Value judgments are not limited to good and bad. All legislative decisions involve value judgments of a political nature and so do delegated legislative decisions.

■ When an agency determines whether certain facts constitute good cause, for example, a decision either way reflects a choice of policy which is essentially legislative in that it refines a general legislative policy. For example, whether sexually discriminatory conditions are good cause for terminating employment is a matter of policy which the legislature can either specify in a statute or delegate. *Cf. Fajardo v. Morgan,* 15 Or App 454, 516 P2d 495 (1973). The delegation of responsibility for policy refinement under such a statute is to the agency, not to the court. The discretionary function of the agency is to make the choice and the review function of the court is to see that the agency's decision is within the range of discretion allowed by the more general policy of the statute. This decisional relationship of agency and courts in contested cases is provided for in ORS 183.482 (8)(b):

"The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision."

*McPherson* involved an agency charged with the duty of administering an act by applying it adjudicatively to individual situations. The same pattern of legislative delegation and judicial review is more apparent where the legislature charges an agency with broad regulatory responsibility. Regulatory schemes may involve delegation of broader, almost plenary authority to make the policy decisions, legislative in nature, necessary to accomplish political objectives which the legislature expresses in general

terms. For example, *Megdal v. Board of Dental Examiners* involved a general term in a licensing statute, "unprofessional conduct." We held, consistently with *McPherson,* that the term expresses a legislative objective, but does not represent completed legislation. The legislature could have specified in the statute whether false statements by a dentist to an insurer were cause for license revocation, but it did not do so. Instead, by use of the term "unprofessional conduct," it expressed a general legislative policy and delegated to the licensing agency the authority and responsibility to complete the legislation by rule specifying what specific acts could be the basis for license revocation. 288 Or at 314.[6]

The same principles apply to larger regulatory contexts. For example, the Oregon Liquor Control Commission performs its licensing function of the alcoholic liquor industry as "demanded by public interest or convenience," ORS 471.295(1), and that phrase is to be "liberally construed" to achieve several legislative policies, such as "[t]o protect the safety, welfare, health, peace and morals of the people of the state," ORS 471.030(1)(c). Likewise, the Public Utility Commissioner is required to regulate public utilities so as to allow them rates that are "just and reasonable," ORS 757.210, and to "protect such customers, and the public generally, from unjust and unreasonable extractions and practices and to obtain for them adequate service at fair and reasonable rates," ORS 756.040(1). The legislature can, if it chooses, enact more specific statutes as to liquor licensing policy and it could set utility rates from time to time by statute, but it does not. Rather, the agencies are empowered to regulate and, in so doing, to make delegated policy choices of a legislative nature within the broadly stated legislative policy. *See Crouse v. Workmen's Comp. Bd.,* 26 Or App 849, 853, 554 P2d 568 (1976).

---

[6] In *Megdal,* we held that where rule-making authority is given together with broad professional licensing power, an agency could effectuate its delegated legislative authority only by adoption of rules. Three judges concurred that rules were required, but for a different reason: to facilitate judicial review under the Administrative Procedures Act, citing *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973). Although the court divided on the reason for requiring rules, the concurring opinion expressed no disagreement with the analysis by the majority which is referred to in the body of this opinion. On that, the court was unanimous.

## CONDITIONS OF EMPLOYMENT

At issue here is whether the term "conditions of employment" is a term of complete meaning subject to ultimate interpretation by the court or is a term of delegation which authorizes ERB to construe it by a refinement of legislative policy. The statute is not explicit. *Cf. State v. Sargent,* 252 Or 579, 449 P2d 845 (1969). The parties have not cited and we have not found any helpful legislative history on this point.

The term does not stand alone. It appears within a broad statutory scheme to supplant the grace of the state with a labor-management relationship in government similar to that which exists in private enterprise with special provisions pertinent to public service, ORS 243.650 through 243.782. ORS 243.656 declares as policy the interest of the people in harmonious and cooperative labor relations in government, free from interruption and unresolved disputes, through a system of labor organization and collective bargaining.[7] The Employment Relations Board is mandated by ORS 243.766 to oversee that system. Pertinent to ERB's order in this case, subsection (3) grants broad authority for ERB to:

---

[7] ORS 243.656:

"The Legislative Assembly finds and declares that:

"(1) The people of this state have a fundamental interest in the development of harmonious and cooperative relationships between government and its employes;

"(2) Recognition by public employers of the right of public employes to organize and full acceptance of the principle and procedure of collective negotiation between public employers and public employe organizations can alleviate various forms of strife and unrest. Experience in the private and public sectors of our economy has proved that unresolved disputes in the public service are injurious to the public, the governmental agencies, and public employes;

"(3) Experience in private and public employment has also proved that protection by law of the right of employes to organize and negotiate collectively safeguards employes and the public from injury, impairment and interruptions of necessary services, and removes certain recognized sources of strife and unrest, by encouraging practices fundamental to the peaceful adjustment of disputes arising out of differences as to wages, hours, terms and other working conditions, and by establishing greater equality of bargaining power between public employers and public employes;

"Conduct proceedings on complaints of unfair labor practices by employers, employes and labor organizations and take such actions with respect thereto as it deems necessary and proper."

The same statute provides an enforcement mechanism and authorizes ERB to conduct studies and make recommendations. The pertinent statutes are too lengthy to set out here. In summary, they regulate labor organization, bargaining, representation, mediation, factfinding, strikes, arbitration, and other aspects of public labor relations and assign administrative, regulatory and enforcement responsibilities to ERB for effectuation of the statutes. It is within this broad context that we look to the specific statutory term upon which this case resolves.

ORS 243.672(1)(e) makes it an unfair labor practice for a public employer to refuse to "bargain collectively" with the representative of a bargaining unit. ORS 243.650(4) defines "collective bargaining" to comprehend "employment relations":

" 'Collective bargaining' means the performance of the mutual obligation of a public employer and the representative of its employes to meet at reasonable times and confer in good faith with respect to employment relations, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party. However, this obligation does not compel either party to agree to a proposal or require the making of a concession."

---

"(4) The state has a basic obligation to protect the public by attempting to assure the orderly and uninterrupted operations and functions of government; and

"(5) It is the purpose of ORS 243.650 to 243.782 to obligate public employers, public employes and their representatives to enter into collective negotiations with willingness to resolve grievances and disputes relating to employment relations and to enter into written and signed contracts evidencing agreements resulting from such negotiations. It is also the purpose of ORS 243.650 to 243.782 to promote the improvement of employer-employe relations within the various public employers by providing a uniform basis for recognizing the right of public employes to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers."

"Employment relations" is defined by ORS 243.650(7) to include "other conditions of employment":

> " 'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, grievance procedures and other conditions of employment."

The wording of subsection (7) indicates that the legislature chose to define "employment relations" by example, but did not use an exhaustive list of examples. Rather, it used a general term, "other conditions of employment," intended to allow ERB to include other subjects of like character. The legislature expressed its policy choice by listing definitional examples. The reference to "other" such subjects was not a delegation to ERB to make different choices; rather, it is, in effect, a direction to ERB to replicate the same choice by regarding as "employment relations" only those subjects which embody the same characteristics as "monetary benefits, hours, vacations, sick leave, grievance procedures," and no others. The question of whether any subject is like or unlike the listed matters is one of interpretation, not of discretion. The legislature expressed its meaning fully. Thus, despite the appearance of the term in the context of a broad regulatory scheme, we conclude that the statutory terms "employment relations" and "conditions of employment" were intended to charge ERB with interpretative rather than legislative responsibility.

It is in this respect that the Court of Appeals erroneously read *McPherson* to require that it be bound by the agency interpretation. Complainants are correct in their assertion that interpretation in this case is for the court.

### ERB'S ORDER

Interpretation being a function of law ultimately for the court, we proceed under ORS 183.482(8)(a) to determine whether the administrative interpretation was erroneous. ERB's analysis was in two stages: the formulation of interpretive criteria and the application of those criteria. We will address each in turn.

An interpretation of a statute is essentially an explanation of how the statute applies in a particular

situation or type of situation. Explanation, by its nature, can usually be phrased in more than one correct way. Ordinarily, it is the initial responsibility of the agency, whether by rule or order, to explain the application of the statute to specific facts. Because the function of the court is to review an interpretation if review is sought, rather than to formulate it in the first instance, under ORS 183.482(8)(a) the court must uphold the order unless the agency has "erroneously interpreted a provision of law." Although the court might have expressed the interpretation differently if it had initial responsibility, the question on review is whether the agency interpretation is erroneous, not whether the court would have expressed the interpretation differently.

■ Here, ERB's formulation of interpretive criteria is an accurate expression of the statutory meaning in that it correctly explains the statute without modifying its meaning. ERB deems those aspects of the evaluation proposals which have a greater impact on employment conditions and a lesser effect on "educational policy" to be conditions of employment. That interpretation is not erroneous because those aspects have characteristics similar to the statutory examples of "monetary benefits, hours, vacations, sick leave" and, particularly, "grievance procedures," ORS 243.650(7). Conversely, ERB deems those subjects whose dominant effect is to restrict educational policy (i.e., management prerogatives or proprietary functions as in the private sector) not to be conditions of employment. ERB's interpretation correctly explains the statute and does not change it. Hence, we conclude that it is not an erroneous interpretation and we uphold it.

■ Our review of ERB's application of its criteria to the evaluation proposals presents considerations other than pure questions of law. The process of application of the statute or the interpretation to facts is more adjudicative in nature and a different sort of judgment is required. Any aspect of teacher evaluation affects both educational policy and working conditions to greater or lesser degree. Classifying each part of the proposals according to the dominance of either quality can better be done by one who has special understanding of the regulated activity.

Administrative agencies are generally assumed to have such understanding by reason of the ongoing nature of their responsibility, their familiarity with similar situations, their staff expertise, the background and competencies of their governing commissions, or any combination of these reasons. When the application of statutory policy to fact is entrusted to an agency, and the agency has correctly interpreted the law, then the function of the court on review is not to substitute its judgment, but to uphold any reasoned application of that interpretation to the facts. We next examine ERB's application of the criteria to the facts in that light.

 ERB expressed the reasoning behind its application of the criteria. It refined the *employment/educational policy* distinction by describing three elements of the evaluation processes: bases and use, mechanics and fairness procedures. The order describes them:

"* * * [T]his Board concludes that the subject of teacher evaluation involves three separate but related parts. The first part is the bases for conducting teacher evaluations (e.g., the criteria or standards by which performance is evaluated and/or the areas which are to be evaluated), and the use to which evaluations are put. The second part is the mechanics of conducting teacher evaluations. Mechanics include the form and format to be used, the contents of the evaluation report including recommendations for remedial action, the manner in which the contents are recorded (i.e., checklist, narrative, etc.), who conducts the evaluations, the number of evaluations conducted, and the timing, sequencing and length of evaluation observation periods. The third part of teacher evaluation involves minimum fairness procedures designed to insure teachers notice as to the basis(es) for the evaluations, notice of the evaluation reports and the opportunity to respond to completed evaluation reports."

ERB concluded that the *bases for* and *use of evaluation* related predominantly to educational policy, although they affect teachers' working conditions somewhat, because the bases represent the determination of programs and program standards and the use of evaluation is to determine whether these program standards are being met. The determination and measurement of program standards are management functions.

ERB also concluded that the *mechanics of evaluation* also affect working conditions, but relate primarily to educational policy because the mechanics and bases of evaluation are "inextricably intertwined." The form, content, number and sequence of evaluations, and the resources allocated therefor, ERB reasoned, must be designed to correlate to the program standards and to serve as the basis for subsequent managerial action. Accordingly, both the bases for and uses of evaluation and the mechanics of evaluation were deemed not to be conditions of employment and, hence, subject to permissive rather than mandatory bargaining.[8]

---

[8] The parts of the order containing this reasoning state:

"After weighing the element of educational policy involved in the bases for and use of teacher evaluations against the effect that these matters have on a teacher's conditions of employment, this Board concludes that the bases for and use of evaluations are not conditions of employment within the meaning of the Act and, therefore, are permissive subjects for bargaining. While the bases for and use of evaluations may affect a teacher's working conditions, potentially including the teacher's continued employment, the effect upon a teacher is outweighed by considerations of educational policy. A school district must be able to determine educational programs and program standards. Program and program standards determine the basis(es) for evaluations (e.g., the criteria, or standards by which performance is evaluated and/or areas to be evaluated) and the use of evaluations. In turn, evaluation of personnel and their performance is a primary basis from which to determine whether program standards are being met and maintained.

"The mechanics of teacher evaluation (the form and format to be used, the contents of the evaluation report including recommendations for improvement of deficiencies, the manner in which the contents are reported, who conducts the evaluation, the number of evaluations, and the timing, sequencing and length of evaluation observation periods) may affect a teacher in about the same way that the bases for and use of evaluations affect a teacher's employment. On balance, the element of educational policy involved in the mechanics of teacher evaluation outweighs the effect on a teacher's conditions of employment. The mechanics and the bases for and use of teacher evaluation are inextricably intertwined. The bases for and use of teacher evaluations determine the mechanics of teacher evaluation. As the bases for and use of evaluations change, so are the mechanics likely to change. The criteria, standards and/or areas of evaluation will determine to a large extent the form and format of evaluations, the manner in which the contents of evaluations are reported, the number of evaluations, and the sequencing and length of evaluation observation periods. Some criteria, standards and areas of evaluation lend themselves more easily to narrative reports while other criteria, standards and areas are more easily quantified. The form utilized will reflect these distinctions. The number of evaluations and the timing, sequencing and length of evaluation observation periods are also directly related to the bases for evaluation. Some bases for evaluation require more

ERB next concluded that those parts of the proposals dealing with *procedural fairness* (e.g., notice and opportunity to be heard) had no effect on the formulation and achievement of program and little effect on the allocation of resources, but greatly affected teachers' employment. Hence, procedural fairness procedures were deemed to be subject to mandatory bargaining.[9]

Complainants offer several objections to ERB's three-part test. First, they contend that it differs from caselaw of other states which, essentially, classifies evaluation proposals as substantive (permissively bargainable) or procedural (mandatorily bargainable). ERB considered and expressly rejected this approach in favor of its own more sophisticated formula. Both formulations would usually yield the same result, but there are some holdings in other states requiring mandatory bargaining for some proposals similar to those which ERB would classify as mechanics of evaluation. Obviously, cases from elsewhere are of interest, but are not controlling. The issue on review is not whether another formulation is preferable, but whether ERB's formulation is erroneous. We hold it is not.

---

frequent evaluations, closer sequencing and longer observation periods than other bases. The selection of evaluators is also, to a large extent, determined by the criteria, standards, and/or areas to be observed and evaluated. Furthermore, the assignment and utilization of both administrative and teaching personnel to conduct evaluations goes to the very heart of educational policy. In *Springfield,* this Board held that the criteria, standards and *mechanics* for the assignment and utilization of personnel is a matter of educational policy." (Footnotes omitted.)

[9]

"On balance, the element of educational policy involved in minimum fairness procedures intended to insure teachers notice of and the opportunity to respond to evaluation reports is outweighed by the effect such procedures have on a teacher's conditions of employment. Therefore, the teacher's right to notice as to the basis(es) for evaluations and the results of evaluations, the right to have evaluative statements reduced to writing, the right for teacher objections to evaluative reports to be received and the opportunity to request evaluations are mandatory matters for bargaining. Contrary to the School Districts' arguments, these procedures are distinguishable from the bases for and use of evaluations and the mechanics of evaluation. Teachers have a strong interest in assuring notice and the opportunity to be heard regarding evaluations actually conducted. * * *"

Complainants also challenge the classification as being unsupported by substantial evidence. They argue that the three parts have not been shown by the evidence to bear the relationship to educational policy or employment conditions which ERB concludes they have. This objection misconceives the classification. It is an analytical device, not a finding. The application of ERB's statutory interpretation must be reasoned and the classification is a part of ERB's reasoning process rather than a finding for which there must be evidence.

The order is specific as to every aspect of the proposals. As to each, the classification is supported by reasoning. The order is too lengthy to set out, but an excerpt is illustrative of this section of the order:

"3.j. 'D. *Each teacher shall have the right, upon request to review the contents of his own personnel files exclusive of materials received prior to the date of his employment by this district. A representative of the Association may at the teacher's request accompany the teacher in this review.* Each teacher's personnel file subject to review shall contain the following minimum items of information:

1. All teacher evaluation reports.
2. Photostatic copy of teacher's certificate.
3. Transcript of academic records.
4. Tenure recommendation.

*Copies of annual contracts of the teacher shall be available for inspection by the teacher* in the office of the clerk. *The teacher may respond to any item placed in such personnel file and said response shall become a part of said file.'*

"The above underlined language from Paragraph D involves mandatory matters for bargaining. This language addresses the teachers right to: access his/her personnel file, be accompanied by an association representative when reviewing the file, respond to any item in his/her file, and have that response included in the file. These provisions are intended to provide teachers with notice and the opportunity to consider and respond to matters directly affecting their employment. The language not underlined above which attempts to define the contents of the personnel file is a permissive subject for bargaining. While it may be appropriate, and even necessary, for a school district to have these materials on file, the location of these materials is, on balance, a matter of educational policy because of its heavy effect on the organization and administration of

district wide records and accounting policies. Likewise, the repository for teacher contracts is a permissive subject for bargaining. However, the right to inspect teacher contracts or any other record in the school district's possession which directly affects a teacher's employment, and is not exempt from inspection by law, is a mandatory subject for bargaining.

"To the extent that Respondent School Districts refused to discuss Complainants' proposals related to teacher evaluation herein found to be mandatory subjects for bargaining, the School Districts have refused to bargain in good faith within the meaning of ORS 243.672(1)(e)."

Because the reasoning of this section is express, it is adequate for judicial review. Because it rationally relates the decision to the interpretive criteria which, in turn, express the meaning of the statute, we uphold ERB's conclusion.

█ On the same basis, we uphold all aspects of the order except for one. The order states this proposal:

"3.e. 'Criteria for the evaluation of all teachers shall be clearly defined.' "

The order then states this conclusion:

"The above language from Paragraph A is permissive. The bases for evaluations, including the criteria, standards and areas of evaluation are permissive matters for bargaining. Requiring negotiations over criteria, as opposed to requiring negotiations over whether the School Districts will make the bases for evaluations available to teachers, has the effect of requiring the School Districts to negotiate the bases for evaluation."

This reasoning appears to assume incorrectly that a proposal to require clarity of definition would require bargaining regarding the content or substance of the criteria. We read it as proposing only that the parties bargain as to whether evaluative criteria must be defined clearly, whatever the substance of the criteria may be. To use ERB's phrase, the proposal does not purport to subject the *bases of evaluation* to mandatory bargaining. The reasoning expressed in the order is faulty in this respect and cannot be upheld.

Applying ERB's criteria, a contrary result is required on proposal 3.e. Teacher performance is to be evaluated for conformity to the program and performance standards embodied in the bases of evaluation. Promotion

and job security of teachers are likely to be affected by teacher evaluation. The ability of a teacher to object under proposal 3.g. to an evaluation as incomplete or unjust depends upon the ability of the teacher to ascertain the criteria under which he or she is being evaluated. In this sense, a proposal for a contract requirement that the evaluation criteria be clearly defined is akin to the notice and objection proposals which ERB has classified as fairness procedures subject to mandatory bargaining.

On the other side, management has a predominant need to determine the content and substance of its educational objectives and the criteria by which it determines whether those objectives are being achieved. A requirement that the criteria be clearly defined would not restrict the discretion of the school districts to determine such policy. Indeed, clear definition is often an essential tool in policy development and any managerial prerogative to state criteria unclearly would be of dubious value. We can see, and the school districts have suggested, no restriction on management prerogatives which would result from the outcome of mandatory bargaining over whether the criteria for evaluation should be clearly defined. Because the effect of clarity of definition of evaluation criteria on teacher employment conditions is great and the restrictive effect on educational policy is minimal, then, applying the interpretive criteria of ERB, we conclude that proposal 3.e. is subject to mandatory bargaining.

Having concluded that ERB erred regarding this proposal and that a correct interpretation of law "compels a particular action," we are authorized by ORS 183.482(8)(a) to set aside or modify the order or to remand the case to ERB for further action. Because this litigation has been protracted, because we uphold the order in all other respects, because the order may simply be corrected by modification in this single respect, and because no further determinations need be made by ERB to completely resolve the complaints, we elect to modify the order. The order is modified so as to include paragraph 3.e. regarding clarity of definition of evaluative criteria within the aspects of the complainants' proposals about which respondent school districts are ordered to cease and desist from refusing to bargain. In all other respects, the order is upheld.

Modified.