Argued and submitted February 12, affirmed June 23, 1982

## EUGENE EDUCATION ASSOCIATION,
*Petitioner,*

*v.*

## EUGENE SCHOOL DISTRICT NO. 4J et al,
*Respondents.*

### (No. C-53-79, CA A22553)

648 P2d 56

Henry H. Drummonds, Portland, argued the cause for petitioner. With him on the brief was Kulongoski, Heid, Durham & Drummonds, Portland.

Joe B. Richards, Eugene, argued the cause for respondents Eugene School District No. 4J and Richard Miller. With him on the brief was Luvaas, Cobb, Richards & Fraser, Eugene.

Jan Peter Londahl, Assistant Attorney General, Salem, waived appearance for respondent Employment Relations Board.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Young, Judge.

GILLETTE, P. J.

### GILLETTE, P. J.

This judicial review of an order of the Employment Relations Board (ERB) has been before us previously. In *Eugene Ed. Assoc. v. Eugene School Dist. 4J*, 48 Or App 747, 617 P2d 935 (1980), we considered an ERB order that held that a definition of "grievance" proposed for use in a contract between the Eugene Education Association (the Association) and the Eugene School District (the District) was a "permissive," rather than "mandatory," subject of collective bargaining. We held that ERB had not explained the rationale for its original order; we therefore remanded for further consideration. On remand, ERB adhered to its original determination that the proposal at issue is a permissive subject of bargaining, but offered a complete explanation of its reasoning. We affirm.

The Association's proposal provides:

"Grievance: A grievance is a claim based on an alleged inequitable or unfair event or condition CAUSED BY THE VIOLATION of *written school board policies, written administrative rules and regulations,* mandatory bargainable practices or the interpretation, application or violation of provisions of this agreement.

"Disputes involving either attempts to change the collective bargaining agreement or representation disputes arising under ORS 243.682, 243.686, or 243.692 are not grievablve under this provision.

"Nothing in this section is intended to restrict the District's right to unilaterally change written school board policies, written administrative rules and regulations or practices that are determined to be permissive subjects of bargaining." (Emphasis supplied.)

■ The Association argues that the inclusion of the emphasized language makes this proposed definition a mandatory subject of bargaining, because it involves either "grievance procedures" or "other conditions of employment" under ORS 243.650(7):

" 'Employment relations' includes, but is not limited to, matters concerning direct or indirect monetary benefits, hours, vacations, sick leave, *grievance procedures and other conditions of employment."* (Emphasis supplied.)

A refusal to bargain about "employment relations" is an unfair labor practice, ORS 243.650(4), and bargaining subjects that are specifically enumerated in ORS 243.650(7) are *per se* mandatory bargaining subjects. *Eugene Ed. Assoc. v. Eugene School District 4J, supra (Eugene II); Eugene Ed. Assn. v. Eugene Sch. Dist.,* 46 Or App 733, 613 P2d 79 (1980); *Springfield Ed. Assn. v. Sch. Dist.,* 24 Or App 751, 547 P2d 467, *modified on other grounds,* 25 Or App 407, 549 P2d 1141, *rev den* (1976); Matters not specifically mentioned in ORS 243.650(7) are mandatory subjects of bargaining only if their im  ict on employment conditions outweighs their impact on educational policy. *Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980) *(Springfield II); Eugene II, supra.*

■  In the present case, ERB determined that the proposal did not concern a "grievance procedure" under ORS 243.650(7), explaining:

> "Proposals about grievance *procedures* are mandatory topics *per se,* while proposals about the *substance* of arbitrable disputes must be subjected to the balancing test. The proposal at issue here addresses the question, 'what sorts of disagreements shall be subjected to the grievance procedure (whatever that procedure is),' and *not* the very different question, 'what procedures shall we establish to resolve (some sorts of) disagreements?' The statute specifically lists 'grievance *procedures'* among the *per se* mandatory topics: for example, proposals to structure the grievance procedure in two steps or in three; to have or to omit a union management committee; to require written submission, to require a response within ten days, or twenty, at each step; to deem an unanswered grievance denied at any step; to culminate in advisory arbitration or in binding arbitration, et cetera. All of these address the mechanism to be established for dealing with disagreements and are 'matters concerning * * * grievance procedures' within the terms of ORS 243.650(7). The proposal here, on the other hand, addresses not the question, 'How shall the grievance mill be designed,' but rather, 'What shall be the grist for it?' "

ERB went on to observe that its interpretation of the term "grievance procedures" had been tacitly approved by the Supreme Court in *Springfield II, supra,* in which the court affirmed the application of a balancing approach to the

determination of whether a proposal that teachers be allowed "to utilize the grievance procedures" to contest an evaluation believed to be "incomplete or unjust" was a mandatory subject of bargaining.

The Association argues that the proposal concerns a "grievance procedure" under the statute, because it merely defines the types of disputes subject to the procedure and does not create any new substantive rights, but only creates a new forum for the vindication of already existing rights.

The scope of our review of ERB's determination was explained in *Springfield II, supra*. In that case, the Supreme Court held that in ORS 243.650(7) the legislature had "expressed its policy choice" by listing definitional examples to define the term "employment relations" and that ERB's responsibility in applying the term "other conditions of employment" is one of interpretation, not discretion. Clearly, the same analysis applies to the term "grievance procedure." As the court explained in *Springfield II:*

"An interpretation of a statute is essentially an explanation of how the statute applies in a particular situation or type of situation. Explanation, by its nature, can usually be phrased in more than one correct way. Ordinarily, it is the initial responsibility of the agency, whether by rule or order, to explain the application of the statute or specific facts. Because the function of the court is to review an interpretation if review is sought, rather than to formulate it in the first instance, under ORS 183.482(8)(a) the court must uphold the order unless the agency has 'erroneously interpreted a provision of law.' Although the court might have expressed the interpretation differently if it had the initial responsibility the question on review is whether the agency interpretation is erroneous, not whether the court would have expressed the interpretation differently." 290 Or at 234.

We believe that ERB's interpretation of the term "grievance procedures" correctly interprets the statutory term. We do not believe the legislature intended that any subject become a mandatory subject of bargaining simply because it is included in a proposed definition of "grievance." As ERB points out, the statutory term is "grievance *procedures,*" not simply "grievances." ERB's interpretation that the substance of a grievance is only a mandatory

subject of bargaining if it is itself enumerated in the statute or if it is an "other condition of employment" through application of the balancing process, gives meaning to the phrase "grievance *procedures,*" while retaining the requirement of mandatory bargaining over topics included by the legislature in the definition of "employment relations." We therefore turn to ERB's application of the balancing process to determine whether the proposal concerns "other conditions of employment."

■ We note first that the *content* of the "written school board policies, written administrative rules and regulations" referred to in the Association's proposal is agreed to be a non-mandatory subject of bargaining. The question is whether the creation of "an alleged inequitable or unfair event or condition CAUSED BY THE VIOLATION" of the policies, rules and regulations is a condition of employment. The Association argues that the district can have *no* interest in maintaining a violation of a policy, rule or regulation and that a balancing of interests must result in finding that the proposal concerns a condition of employment. ERB, on the other hand, found that if the proposal were a mandatory subject of bargaining potentially subject to arbitration, the proposal would have a greater effect on educational policy than on employment conditions. It explained:

> "In the present case, the Association desires to bargain a grievance procedure requiring third party review of alleged violations of District policies and rules, the subject matter of which the Association cannot otherwise require bargaining over. Could such third party 'review' affect the *substance* of these permissive matters? We believe it not only possible, but probable. An arbitrator cannot 'rule' on an alleged policy/rule *violation* without first deciding what the particular policy or rule does, or does not require (i.e. without determining the *substance* or *content* of the language at issue). In so deciding, the arbitrator gives a policy its meaning - a meaning which might well be at variance with the District's own interpretation. * * *

> "Of course the submission of written educational policy matters to the scrutiny of an arbitrator might have minimal impact on the content of those policies if the arbitrator's interpretation of the writing were always in step with the District's. But when an employer submits its

written policies to an arbitrator's review, it agrees to abide the questionable and the flatly wrong interpretations it may receive as well as the 'correct' ones. This Board enforces arbitration awards, issued within the arbitrator's authority, without regard to the correctness of the arbitrator's interpretation of the contract language (or, here, policy language) at issue. * * * In the usual case the arbitrator will have been asked to interpret the parties' agreement involving their employment relations as defined by the Public Employe Collective Bargaining Act (PECBA) [.] In the present case, however, the arbitrator will be asked to interpret the written promulgations of the District which do not involve employment relations, but are matters of pure educational policy. Indeed the bulk of the District's written policy is largely expressed in precatory language, if not in outright pious hopes; for example:

> 'The schools' primary role is to provide an environment in which the students can acquire the necessary knowledge, abilities, skills, attributes and understandings which enable them to become effective citizens in a community.'

"We shudder to contemplate an arbitrator's pronouncement when asked to determine whether the violation of this policy resulted in an 'unfair event.' We entertained similar misgivings, in our original order, over submitting to the arbitrator the proper interpretation of the District's policy on student discipline, including the policy that discipline will be applied 'fairly and consistently.' * * * Indeed this parade of horribles can be extended on and on by opening the District's 150 page School Board Policy Statement almost at random. And this is no accident. Unlike the language of bargained contracts, written school board policy statements often contain a great deal of pious hope and very little of specific directive. We believe that such policy generalizations serve a distinct leadership function proper to a school board; but that function is sometimes incompatible with the function which *contract* language must fulfill, including surviving the scrutiny of an arbitrator. The impact of the Association's proposal, in short, would be to force the District to couch *all* of its written pronouncements with the care appropriate for the language of a legal contract. Policy language simply does not lend itself to such precision. The proposal is permissive." (Footnotes omitted.)

Our function on review in cases of this kind is to uphold any reasoned application of law, as correctly interpreted, to the facts presented. *Springfield II, supra,* 290 Or at 235. We conclude that ERB has adequately explained the reasoning behind its determination that this proposal will have a greater impact on educational policy than on employment conditions, and we uphold ERB's conclusion because "it rationally relates the decision to the interpretive criteria which, in turn, express the meaning of the statute." *Springfield II, supra,* 290 Or at 239.

Affirmed.