Argued and submitted December 22, 2003, order revoking parole vacated;
remanded for further proceedings April 7, 2004

EVERETT WENDELL BRUNDRIDGE,
*Petitioner,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
*Respondent.*

A116831

87 P3d 703

Irene B. Taylor, Deputy Public Defender, argued the cause for petitioner. With her on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services. On the supplemental brief was Everett Wendell Brundridge, *pro se*.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

The Board of Parole and Post-Prison Supervision (board) revoked petitioner's parole because he allegedly violated two conditions: He was found in possession of a hunting knife contrary to the condition that he was not to possess "weapons," and he went to a middle school in violation of the condition that he was not to "frequent any place where minors are likely to congregate." Petitioner argues that the hunting knife was not a "weapon" and that, by going only once to a place where minors were likely to congregate, he did not "frequent" that place. We agree with petitioner's second argument. We vacate the order revoking parole and remand for further proceedings.

Petitioner was convicted of rape in 1984 and released on parole in 1993. One of the conditions of parole was that he "[n]ot possess weapons, firearms, or dangerous animals." Another condition provided, "Offender shall have no contact with minor females and shall not frequent any place where minors are likely to congregate (e.g., playgrounds, school grounds, arcades) without prior written approval from [his] supervising officer." In March 2001, a witness observed petitioner sitting in parked truck and directing a video camera toward a group of young girls at a nearby middle school.[1] The observer notified police, and they notified petitioner's parole officer. During a subsequent search of petitioner's residence, police found a hunting knife with a five-and-one-half inch blade in his bedroom nightstand drawer. Petitioner claimed the knife was a family heirloom that he used only for "camping, exploring and fishing."

Revocation proceedings ensued. A hearing officer recommended that petitioner's parole be revoked for violating the conditions involving possession of weapons and not

---

[1] Petitioner claims that the camera contained no film or memory card and that he was only pretending to videotape the girls in a conscious effort to have his parole revoked so he could return to prison and alleviate his homelessness. The administrative law judge who presided over petitioner's hearing did not entirely believe that story. Whether it is true or not is irrelevant, however, because petitioner does not dispute the fact that he was in a place where minor females were likely to congregate.

"frequenting" any place where minors were likely to congregate. The board followed the hearing officer's recommendation. Petitioner seeks judicial review.

The parties agree that the authorities lawfully found the hunting knife and that on one occasion petitioner went to a place where minor females were likely to congregate. The only issues before us, then, are whether the board erred in concluding that the hunting knife was a "weapon" and that petitioner "frequented" the middle school by going there once.[2] The quoted terms derive from ORS 144.270, which lists the conditions that a board may impose upon all paroled persons and that it must impose on persons convicted of sex crimes. As relevant to petitioner's arguments, the statute provides:

"(2)  The board shall determine, and may at any time modify, the conditions of parole, which may include, among other conditions, that the parolee shall:

"* * * * *

"(e)  Not own, possess or be in control of any weapon.

"* * * * *

"(3)(b)  If the person is on parole following conviction of a sex crime, * * * the board shall include all of the following as special conditions of the person's parole:

"* * * * *

"(C)  A prohibition against frequenting, without the prior written approval of the board or supervising officer, a place where persons under 18 years of age regularly congregate."

ORS 144.270. The disputed terms of petitioner's conditions of parole mirror those provisions. We therefore treat the board's interpretation of the key terms as the board's interpretation of the statutory terms.

---

[2] Although the condition that petitioner allegedly violated required him to have "no contact with minor females" as well as not to "frequent any place where minors are likely to congregate," the board made no finding regarding the first requirement. Its revocation decision was based entirely on the second. We express no opinion regarding whether petitioner's conduct amounted to "contact" with females.

■     Petitioner and the state appear to agree that we review the board's order for substantial evidence. That is not entirely correct. Although we review the historical facts for substantial evidence, ORS 183.482(8)(c), the relevant facts are not in dispute. We would review the interpretation of statutory terms for substantial evidence only if the terms were "exact." *Springfield Education Assn. v. School Dist.*, 290 Or 217, 223-24, 621 P2d 547 (1980). Exact terms "impart relatively precise meaning, e.g., 21 years of age, male, 30 days, Class II farmland, rodent, Marion Country." *Id.* at 223. "Weapon" and "frequent" do not fit within that category. Nor are the terms delegative, in which case the board could not apply them without prior rulemaking; such terms implicate a preference for agency refinement of generally expressed legislative policy and include such phrases as " 'good cause,' " " 'fair,' 'unfair,' 'undue,' 'unreasonable,' or 'public convenience and necessity.' " *Id.* at 228. Rather, "weapon" and "frequent" are "inexact terms," and we must determine whether the board's interpretations of them coincide with the legislative policy inherent in ORS 144.270. *Id.* at 225. Those are straightforward legal questions of statutory interpretation. *Id.* Accordingly, we review the board's interpretation without deference.

■     Petitioner argues that an item is a weapon for purposes of ORS 144.270(2)(e) only when it is carried by a person who intends to use it as such. To the extent that criminal statutes using the term "weapon" bear on the meaning of the term in a parole context, petitioner's argument has some plausibility. ORS 161.015(1) defines "dangerous weapon" as "any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious bodily injury." However, an intent to use the item to cause death or serious bodily injury only makes it a "dangerous" weapon; that does not imply that the absence of intent to harm distinguishes weapons from ordinary objects. Other definitions in Oregon's Penal Code indicate that culpability for possession of a weapon does not depend on the bearer's intention to inflict harm but on the item's physical characteristics: ORS 166.270(2) states that any person convicted of a felony in Oregon is guilty of the crime of

felon in possession of a restricted weapon if the person owns, has in his possession, or carries any "dirk, dagger or stiletto;"[3] ORS 166.360(5) defines "weapon," for the purposes of establishing culpability for the possession of a weapon in a public facility, as "any dirk, dagger, * * * or a knife other than an ordinary pocket knife, the use of which could inflict injury upon a person or property"; and ORS 166.275, which prohibits inmate possession of weapons, defines weapons as "including but not limited to * * * [a] dagger [or] sharp instrument * * *."

Further, even if intention to inflict harm were the defining characteristic that could turn an ordinary implement into a weapon, petitioner's argument would not help him. Although he testified that he intended the knife as equipment for "camping, exploring and fishing," police found it in a drawer of a nightstand in his bedroom, an unlikely venue for any of its claimed uses. The most logical inference flowing from the knife's location is that its intended use was as a weapon—a defensive weapon, perhaps, but a weapon nonetheless.

The more persuasive argument supporting the board's interpretation, however, relies not on definitions in other, tenuously related statutes, but on the plain meaning of the word "weapon" in ordinary legal discourse. One good place to seek such a meaning is in judicial opinions. In that context, Oregon courts routinely refer to knives as weapons. In *State v. Weems*, 190 Or App 341, 344-45, 79 P3d 884 (2003), for example, we wrote, "[T]he officer noticed a *large knife* attached to the defendant's belt. When the officer asked the defendant whether he had any *other weapons*, the defendant did not respond directly, but instead moved his hand towards his pocket." (Emphasis added.) *See also State v. Clew*, 187 Or App 322, 324, 67 P3d 420 (2003) ("[T]he officer noticed a *knife* approximately ten inches long in a sheath on defendant's belt. [He] asked defendant whether he possessed any *other weapons*." (emphasis added)); *State v. Stephens*, 184 Or App 556, 559-60, 56 P3d 950 (2002), *rev den*, 335 Or

---

[3] A "dirk" is "a long straight-bladed dagger," *Webster's Third New Int'l Dictionary* 642 (unabridged ed 1993); a "stiletto" is a "slender dagger," *id.* at 2243; and a "dagger" is defined as "short knife used for stabbing," *id.* at 570.

195 (2003) (referring to knife as weapon for purposes of officer's concern for safety); *State v. Bridgeman*, 173 Or App 37, 39, 23 P3d 370 (2001) ("[D]efendant had several *knives* and *other weapons* on his belt[.]" (emphasis added)); *State v. Gilkey / White*, 172 Or App 95, 101, 18 P3d 402 (2001) ("Foster testified that, in his experience as an officer, he had found *weapons, including knives*, * * * inside ChapStick containers." (emphasis added)). This routine usage does not, of course, mean that we have held knives to be weapons. The cases do not address the issue, and that is the point: The fact that we more or less automatically attribute a particular meaning to an ordinary word indicates that the meaning is generally accepted. Put another way, the particular uses that writers make of a word constitute the data on which a dictionary bases its definition.[4] In the present case, those data demonstrate that, in ordinary legal discourse, a hunting knife, stored where one would logically store it with the intention of using it to defend against an attacker, is a weapon. The board did not err in so concluding.

■ We cannot say the same about its conclusion that petitioner "frequented" the vicinity of the middle school by going there once. "Frequent," even more than "weapon," is a commonly used word and not a term of art. Again, its use in other legal discourse provides guidance to its plain, natural, and ordinary meaning. Eleven Oregon statutes use the term "frequent" as a verb. None of them makes sense if "frequent" means "to visit one time." For example, ORS 279.316(1)(b) requires employers to "give notice to employees who work on a public contract in writing * * * by posting a notice in a location frequented by employees, of the number of hours per day and days per week that the employees may be required to work." No employer would argue that it complied by posting a notice where employees might go on only one occasion. Likewise, ORS 658.717(1) requires every operator of a farm worker camp to "[p]ost an informational notice * * * in an area of the farmworker camp frequented by the occupants." Again, ORS 469.735(3)(a) defines a "public building" as one which is "open to and frequented by the public"; surely an

---

[4] According to *Webster's*, a weapon is, unhelpfully, "an instrument of offensive or defensive combat," *id.* at 2589, while a knife is, circularly, "a weapon consisting of or resembling a knife," *id.* at 1249.

otherwise private building that holds a single open house is not "public" under this definition. And finally, contrary to respondent's assertion that ORS 167.222(1), defining the offense of frequenting a place where controlled substances are used, has "no requirement that the contact with the place be repeated," subsection (4) of that statute explicitly provides that "[a]s used in this section, 'frequents' means repeatedly or habitually visits, goes to or resorts to."

Dictionaries confirm this usage. *Webster's* defines "to frequent" as "to associate with, be in, or resort to often or habitually : visit often." *Webster's Third New Int'l Dictionary* 909 (unabridged ed 1993).[5] The more authoritative *Oxford English Dictionary* defines "to frequent" as "[t]o visit or make use of (a place) often; to resort to habitually * * *." 6 *The Oxford English Dictionary* 179 (2d ed 1989). In *The American Heritage Dictionary* 526 (New College Edition 1979), the definition is "[t]o pay frequent visits to; be in or at often." These definitions all highlight the obvious fact that the verb "to frequent" is back-formed from the adjective "frequent," which, of course, means "often."

In the absence of any textual or contextual evidence to the contrary, then, we conclude that "frequent" is not ambiguous. The legislative and board mandate that petitioner "shall not frequent any place where minors are likely to congregate" does not prohibit petitioner from going to such a place one time.

Respondent's contrary arguments are unpersuasive. It first contends that we owe the board's interpretation "assumptive validity," citing *Springfield Education Assn.*, 290 Or at 227-28. The complete quotation, however, reads:

"An agency interpretation may be given an appropriate degree of assumptive validity if the agency was involved in the legislative process or if we infer that it has expertise

---

[5] Respondent contends that the first portion of the definition lists three synonyms with the adverbs "often or habitually" modifying only the last. We disagree. The adverbs are suspended and apply with equal force to all of the preceding verb phrases. Compare the definition of "to recur": "to happen, take place, or appear again." *Webster's* at 1900.

based upon qualifications of its personnel or because of its experience in the application of the statute to varying facts. Judicial deference, however, is not automatic or unreasoning."

*Id.* We have found no indication that either the Department of Corrections or the Board of Parole was significantly involved in the legislation adopting the term "frequent." Nor do board members have qualification-based expertise, as do, for example, practitioner-members of licensing boards, and to the extent that they do, their expertise has nothing to do with their ability to define a common verb. And while board members might have experience in applying the statutory terms to varying facts, we do not know that to be the case and, in any event, that experience and the deference it might command are not significant enough to lead us to substitute their interpretation for the one universally adopted in the population at large.

■ Respondent also argues that adopting the plain meaning of "frequent" would permit petitioner "to visit any place where minors are likely to congregate if he only went once to each location * * *. Such an interpretation of the parole condition is absurd in light of its obvious purpose." We note first that, in some respects, respondent's interpretation is as absurd as petitioner's: Respondent would justify revoking petitioner's parole for taking a single trip to the food court at the local mall or getting off a bus at a downtown terminal. In any event, however, where a term has an unambiguous meaning, the fact that it could lead to an absurd result does not justify interpreting it to mean something else. *State v. Vasquez-Rubio*, 323 Or 275, 282-83, 917 P2d 494 (1996) (Oregon courts should not apply absurd-result maxim when meaning is unambiguous). We therefore conclude that petitioner did not "frequent" a place where minors were likely to congregate.

Because the board did not indicate in its order whether it would have revoked petitioner's parole on the basis of the weapons violation alone, and, if so, "[b]ecause the erroneous finding might have influenced the severity of the Board's ultimate sanction following revocation," *Mageske v.*

*Board of Parole*, 173 Or App 209, 215, 21 P3d 150 (2001), we remand for further consideration.[6]

Order revoking parole vacated; remanded for further proceedings.

---

[6] Respondent does not argue (and we do not decide) that the principle underlying *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 61 P3d 928 (2003), that is, that the rule against reversing for nonprejudicial error compels a court to affirm when it has rejected only one of multiple theories that might have justified the lower tribunal's judgment, applies in the administrative setting.