Argued and submitted January 29, affirmed August 4, petition for review denied November 9, 1999 (329 Or 479)

## JELD-WEN, INC.,
### an Oregon corporation,
### *Petitioner,*

*v.*

## ENVIRONMENTAL QUALITY COMMISSION,
### *Respondent.*

### (AQP-ER-97102; CA A101910)

986 P2d 582

Jay T. Waldron argued the cause for petitioner. With him on the brief were Neal A. Hueske and Schwabe, Williamson & Wyatt, P. C.

Denise Fjordbeck, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

DEITS, C. J.

---

\* Deits, C. J., *vice* Warren, P. J., retired.

**DEITS, C. J.**

Petitioner Jeld-Wen, Inc., seeks review of a declaratory ruling of the Environmental Quality Commission (EQC) in which EQC concluded that the sewer system of the City of Klamath Falls (the City) was "available" to petitioner under ORS 454.655(4) and OAR 340-071-0160(5)(f). The ruling means that, under the statute and the rule, petitioner is not entitled to a permit to repair and enlarge its septic tank and drainfield sewage system but must, instead, connect to the City's system. EQC also rejected petitioner's constitutional challenges to that requirement. We affirm.

We take the facts from EQC's order, which adopted the facts that petitioner presented in its request for a declaratory ruling. *See* OAR 137-002-0040 (facts on declaratory ruling are those presented in petition or in statement to which all parties have stipulated). Petitioner owns and operates a wood products facility in Klamath County. The facility abuts the Klamath Falls city limits and is within the City's urban growth boundary. The City is able to and will provide sewer service to petitioner, provided that petitioner's property is annexed to the City. There is no available county or other sewer system. Since 1978, petitioner has operated its current septic tank and drainfield system under a permit from the Department of Environmental Quality (DEQ); before May 1997, there were no problems with or regulatory violations related to that system.

In early May 1997, petitioner discovered signs that its system was potentially failing. It immediately notified DEQ, which evaluated the site and determined that a modified system was acceptable under certain conditions. DEQ, nevertheless, denied petitioner's request for a permit for the modified system because it concluded that the City's system was available to petitioner, even though the City would provide sewer service only if petitioner agreed to annexation. Petitioner does not want to be annexed to the City because doing so would require it to pay significantly higher property taxes in addition to the connection and user fees for the sewer.

At DEQ's suggestion, petitioner sought a declaratory ruling from EQC, asking it to interpret the statute and to hold that the City's sewer system is not available because petitioner must consent to annexation as a condition of receiving service. *See* ORS 183. 410. EQC agreed to issue a declaratory ruling and appointed a presiding officer who, after hearing argument, prepared a proposed order essentially accepting DEQ's position. After consideration, EQC, by a three-to-two vote, adopted the proposed order. Petitioner then sought judicial review. ORS 183.482.[1]

ORS 454.655 generally prohibits constructing or installing a subsurface sewage disposal system without a permit from DEQ. Subsection (4) requires DEQ to issue a permit after receipt of an application and permit fee, if DEQ finds that the proposed construction will be in accordance with EQC's rules. However, the subsection goes on to provide that "[n]o permit shall be issued if a community or area-wide sewerage system is available which will satisfactorily accommodate the proposed sewage discharge." EQC implemented that portion of the statute in OAR 340-071-0160(5)(f), which requires denial of an application for a permit if:

"A sewerage system which can serve the proposed sewage flow is both legally and physically available, as described in paragraphs (A) and (B) of this subsection:

"(A)   Physical Availability. * * *[2]

"(B)   Legal Availability. A sewerage system shall be deemed legally available if the system is not under a Department connection permit moratorium, and the sewerage system owner is willing or obligated to provide sewer service."

The critical issue here is whether the City's sewer system is available to petitioner under the statute when the

---

[1] Petitioner and the DEQ have agreed on actions that will avoid environmental problems while the case is on review.

[2] The rule uses the number of dwellings on or the projected sewage flow from the property and the distance from the property to the nearest sewer connection point to determine whether the system is physically available. The City's sewer system is physically available to petitioner under the rule. Petitioner does not dispute that fact.

City's willingness to provide sewer service, which is necessary for the system to be legally available under the rule, is contingent on petitioner's agreement to annexation to the City. In answering that question, it is helpful first to discuss the methods for determining the meaning of the statute and the agencies' authority under it.

We begin with the statutory words. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The possibly relevant dictionary definitions of "available," the crucial word, are "capable of use for the accomplishment of a purpose : immediately utilizable" and "that is accessible or may be obtained : personally obtainable[.]" *Webster's Third New Int'l Dictionary,* 150 (unabridged ed 1993). As a physical matter, the City's sewer system is "capable of use" to accomplish the purpose of disposing of petitioner's sewage, is "accessible" to petitioner, and is something that petitioner may obtain. It is thus "available" if those are the relevant definitions.[3]

On the other hand, the system is not "immediately utilizable." Even without regard to the annexation issue, it would take some time to negotiate the exact terms for providing service and there would be a delay between a decision to connect and planning for and completing the actual physical connection. However, those things would inevitably arise in every instance that the statute required connection to a community or area-wide sewage system. Consequently, it is questionable that the legislature intended "available" to mean *immediately* utilizable. At the very least, the statute is ambiguous, because there are at least two plausible meanings of the time period within which a system must be utilizable in order to be "available." On review, the parties do not assert that there is any relevant legislative history. Before EQC, they appear to have agreed that there is none.

■■ The statutory term "available," is an "inexact" term under *Springfield Education Assn. v. School Dist.,* 290 Or 217, 224-25, 621 P2d 547 (1980): The legislature has made a

---

[3] Petitioner argues that the delays involved in annexation are so great that the City's system is not immediately available. Other statements in the record dispute that assertion. Because the statement of facts on which the EQC based its decision does not discuss the issue, we do not consider that factor in our analysis.

complete policy statement, although its precise meaning may not always be obvious.[4] Under *Springfield*, "[w]here the applicability of a term is not certain, its meaning is not a question of lexigraphy, but rather a question of the policy which is incorporated in the legislative choice of that word." *Id.* at 226. It is EQC's function to determine in the first instance what interpretation of the term best effectuates the statutory policy; in a specific instance, it may do so either by rule or by decision in a specific case. We review the agency's application to determine whether it is within the legislative policy that inheres in the term, giving an appropriate degree of credence to EQC's explicit reasoning, particularly in instances where the agency was involved in the legislative process or if we infer that the agency has expertise based on qualifications of its personnel or because of its experience in the application of the statute. *Id.* at 226-28; *see also England v. Thunderbird*, 315 Or 633, 637-38, 848 P2d 100 (1993).

■  An inexact term under *Springfield* is not necessarily ambiguous under *PGE*. Rather, the inexactitude may simply indicate that the legislature left the specific application of its policy to the administrative agency. In this case, EQC, in the rule, interpreted the statutory term by providing details that are consistent with the legislature's policy choice. That is something that is within its authority in carrying out its responsibilities under the statute. The fact that the legislature expressed its policy choice in a term whose meaning is ambiguous in this context is coincidental, not a normal consequence of the use of an inexact term.

■■  Under *Springfield* and *PGE*, when a term is both inexact and ambiguous, the administrative process may assist both in applying the legislative policy to the specific situation and in resolving the overall ambiguity in the term. In complying with its obligations under *Springfield*, the agency may describe the practical application of the term in a way that will suggest the meaning that the legislature intended in using it. Under both cases, this court has the responsibility for construing the statute, but we do so in the context of the

---

[4] That the word "available" is ambiguous in this context does not mean that it is not also *a complete expression of legislative policy*. Rather, our task is to determine what that policy is by using the appropriate tools for resolving the ambiguity.

agency's initial authority to act under it. *See, e.g., Shubert v. Blue Chips,* 151 Or App 710, 720, 957 P2d 172 (1997), *rev allowed* 327 Or 583 (1998); *SAIF v. Cline,* 135 Or App 155, 158-59, 897 P2d 1172, *rev den* 321 Or 560 (1995); *Broadway Deluxe Cab v. Natl. Council on Comp. Ins.,* 133 Or App 324, 329-30, 891 P2d 1326, *rev den* 321 Or 246 (1995). In this case, where we reach the third level of analysis under *PGE*, EQC's explanation of the practical application of the statute can be particularly helpful in understanding what the legislature intended by adopting it.[5]

EQC has given its understanding of the meaning of the statute in two ways: it first adopted OAR 340-071-0160(5)(f), and it then interpreted both the statute and the rule in this case. The rule expands on the statutory requirement by dividing "available" into "physical availability" and "legal availability." In subsection (5)(f)(A), EQC described physical availability through the relationship between the number of dwellings or the amount of expected sewage flow and the distance from the property to the nearest connection point. In subsection (5)(f)(B), it described legal availability as requiring both that a connection be legally permissible and that the system owner be willing or obligated to provide sewer service. The parties do not assert that either subsection is an inappropriate application of the statutory term. However, neither subsection expressly deals with the problem of what conditions the sewer system's operator may impose without becoming unwilling to provide service and, thus, making the system legally unavailable.

In its order in this case, EQC explained how it believes the statute and the rules apply to this situation. It noted that, "[s]trictly speaking," sewer service was not legally available "at this very moment" because of the requirement of annexation. However, it appears that the City would not pose any objections to annexation or sewer service, provided that petitioner agrees to its conditions for annexation. EQC concluded, therefore, that an "area-wide sewer service is, in

---

[5] Understanding the legislature's overall intention in this way is useful at the third *PGE* level when we attempt to determine what the legislature would have done in this situation if it had thought about it. *See, e.g., State v. Gulley,* 324 Or 57, 66, 921 P2d 396 (1996).

effect, legally available to petitioner because the city is 'willing' to provide the service, and the only thing preventing availability of such service is petitioner's refusal to be annexed." EQC also noted that,

> "if annexation as a condition precedent meant a system was not legally available, then few if any applicants would be required to connect to area-wide systems because it seems that annexation is often a pre-condition to connection. It would mean that businesses such as petitioner's would never be required to connect to an area-wide system. ORS 454.655(4) does not seem to allow for such an exception or allow some applicants to control connection to an area-wide system by refusing to annex."

EQC concluded, thus, that to treat a requirement of annexation as an automatic denial of legal availability would seriously subvert the legislature purpose in adopting the statute.

In response, petitioner asserts that several employment cases show that the word "available" *must* mean "immediately available." Therefore, petitioner reasons that, because the result of the requirement of annexation is that the City's sewer system is not immediately available, it is not "available" at all under the statute. In some of the cases on which petitioner relies, the courts held that a job was available under statutes requiring the reinstatement of injured workers only if it was open at the time that the worker applied for reinstatement. *Knapp v. City of North Bend*, 304 Or 34, 741 P2d 505 (1987); *Blumhagen v. Clackamas County*, 91 Or App 510, 756 P2d 650, *rev den* 306 Or 527 (1988). In another case, we held that a job was available under the unemployment compensation statutes only if it was open at the time that the employee applied for benefits. *See Swezey v. Employment Division*, 47 Or App 923, 615 P2d 1103 (1980).

As EQC recognized, employment cases are of little assistance in this context. There is little if any need for preparation before an employee begins work. Thus, for a job to be "available" may well mean that the employee can step right into it. That situation does not involve the kind of negotiations, planning, and construction that are almost inevitable any time that ORS 454.655(4) requires a property owner to connect to a sewer system.

The court's reasoning in *Knapp*, however, is useful in showing the role of an administrative interpretation in construing a statute. The statute at issue in *Knapp* required an employer to reinstate an employee when the employee's former job was "available and the worker is not disabled from performing the duties of such position." ORS 659.415 (1985). The parties made competing arguments concerning whether the former job was "available" when it existed but was not vacant and whether requiring reinstatement, in that circumstance, was consistent with the legislature's policy. The Supreme Court concluded that the legislature had attempted to balance competing interests and that its use of "available" to describe the former job represented some sort of compromise. It then noted that the Bureau of Labor and Industries, which was charged with enforcing the statute, had adopted rules interpreting the term. In those rules, the Bureau stated that a position was available when it was vacant at the time of the demand for reinstatement, became vacant thereafter, or was available under the terms of a collective bargaining agreement or the employer's policy and practices. *Knapp*, 304 Or at 40-41.

After describing the Bureau's rules, the court held that the "interpretation of a statute by the agency charged with its enforcement and administration, although not binding, is entitled to our careful consideration." Although "available" was neither a technical term requiring a high degree of deference to the agency's expertise nor a delegative term under *Springfield*, both the legislature's failure to change the statute, although it had met several times since the adoption of the rule, and the consistency between the use of "available" in the rule and in other sections of the statute supported the Bureau's reasoning. The court therefore concluded that the law required reinstatement only if the former position both existed and was vacant at the time of the request. *Id.* at 41-42.

*Knapp* illustrates the importance that the court places on an administrative agency's interpretation in determining the meaning of statutes that the agency is charged with enforcing. That importance is consistent with the discussion in *Springfield* of the agency's role in explaining inexact terms. The court in *Knapp* did not defer to the Bureau's

interpretation, but it took it into account in understanding how the use of "available" fit into the entire statutory scheme.

In this case, we also find the agency's interpretation helpful in understanding how "available" fits into a very different statutory scheme. EQC's interpretation looks carefully at the overall statutory purpose and how the requirement of availability relates to it. That purpose appears to be to encourage connections to central sewage disposal systems when feasible and to avoid the mushrooming of soil-based systems on individual plots of land. EQC emphasized that annexation is frequently a requirement for connection to a central sewer system and holding that the requirement means that the system is not legally available would essentially exempt businesses such as petitioner's from the statutory requirement. Nothing, thus, suggests that the legislature would have intended a requirement of annexation to turn a system that was physically available into one that was legally unavailable. EQC's decision, thus, both interprets an inexact term in a way that is consistent with the legislative policy, as *Springfield* requires, and provides a basis for determining the meaning of an ambiguous word under *PGE*.

For these reasons, we conclude, under the third *PGE* level, that the legislature did not intend that a requirement of annexation would mean that a central sewer system was unavailable to petitioner. In doing so, we note that the conditions for annexation are essentially the same that would apply to any other property that the City might annex. The expenses of annexation to petitioner, thus, are those that any similarly situated landowner would face.

Petitioner's argument that the DEQ and the EQC do not have the authority to require annexation is irrelevant to our conclusion. The agencies do have the authority—indeed, they have the duty—to require connection to a central sewer system if one is physically and legally available. Because the City's insistence on annexation does not mean that its system is legally unavailable, DEQ cannot legally issue a permit for a septic tank and drainfield system on petitioner's land. The practical effect of that situation may be that petitioner must

consent to annexation when it would otherwise refuse to consent, but that does not mean that DEQ is itself requiring annexation. Petitioner's additional argument that there is no appropriate method of annexation available ignores that, as its own discussion shows, annexation is possible with the consent of the majority of landowners and electors. There are no electors on the territory in question, and petitioner is the only landowner. We turn to petitioner's constitutional arguments.

■ Petitioner's primary argument is that the annexation requirement unconstitutionally restricts the rights of electors and landowners to participate in the annexation process. It relies on *Hussey v. City of Portland*, 64 F3d 1260 (9th Cir 1995), in which the Ninth Circuit held that a subsidy that the city offered homeowners for connecting to a new sewer system if the homeowners irrevocably agreed to annexation, both as landowners and as electors, violated the Equal Protection Clause because it impermissibly burdened the homeowners' right to participate in the annexation process. Aside from the fact that *Hussey* involved annexation and sewers, we do not see its connection to this case. Petitioner is not an elector, and no electors live on petitioner's property; the Ninth Circuit based its decision on the right of electors, not of landowners. No one is attempting to influence petitioner's vote by offering it a subsidy as a reward for agreeing to annexation. Rather, EQC is enforcing the state's policy to emphasize central systems rather than individual land-based disposal as the preferred method of dealing with sewage. If there is a burden of any sort on petitioner, it is a burden that arises from the need to deal with the natural consequences of its business in accordance with the state's policy choice of how best to protect the interests of the public as a whole. There is nothing unconstitutional about that.

Petitioner's other arguments do not require discussion.

Affirmed.