Argued and submitted December 4, 2000, reversed and remanded May 2, 2001

# JEFFERSON COUNTY,
## *Petitioner,*

*v.*

# OREGON PUBLIC EMPLOYEES UNION,
## *Respondent.*

## UP-18-99; A109245

23 P3d 401

Nancy Hungerford argued the cause for petitioner. On the brief were Bruce Bischof and Law Offices of Bruce Bischof.

James Kasameyer argued the cause and filed the brief for respondent.

Paul Snider, Salem, filed a brief *amicus curiae* for Association of Oregon Counties.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Petitioner Jefferson County (the county) seeks judicial review of a determination by the Employment Relations Board (Board) that the county did not have standing to bring an unfair labor practices claim for a violation of ORS 243.672(2)(g)[1] after a union picketed the personal businesses of the county commissioners. The Board ruled that the statute confers standing to bring a claim only on those individuals whose businesses were picketed and not on the county. We reverse and remand.

The county is a public employer as defined by ORS 243.650(20). Its employees are represented by the Oregon Public Employees Union (OPEU). In 1998, OPEU organized picketing of three businesses owned by individual county commissioners after negotiations between the county and OPEU failed to result in a new contract for the bargaining unit employees. The picketing included the business of Mike Ahern, a Jefferson County commissioner. Members of the union handed out flyers and carried signs on the sidewalks and parking lots surrounding the three businesses. The signs and flyers encouraged the public to continue doing business

---

[1] ORS 243.672 provides, in part:

"(2) Subject to the limitations set forth in this subsection, it is an unfair labor practice for a public employee or for a labor organization or its designated representative to do any of the following:

"* * * * *

"(g) For a labor organization or its agents to picket or cause, induce, or encourage to be picketed, or threaten to engage in such activity, at the residence or business premises of any individual who is a member of the governing body of a public employer, with respect to a dispute over a collective bargaining agreement or negotiations over employment relations, if an objective or effect of such picketing is to induce another person to cease doing business with the governing body member's business or to cease handling, transporting or dealing in goods or services produced at the governing body's business. For purposes of this paragraph, a member of the Legislative Assembly is a member of the governing body of a public employer when the collective bargaining negotiation or dispute is between the State of Oregon and a labor organization. The Governor and other statewide elected officials are not considered members of a governing body for purposes of this paragraph. Nothing in this unfair labor practice provision shall be interpreted or applied in a manner that violates the right of free speech and assembly as protected by the Constitution of the United States or the Constitution of the State of Oregon."

with the commissioners in their business capacity but suggested that it pressure them to bargain with the union in their representative capacity about a new contract. At least one customer was deterred from shopping at Commissioner Ahern's store during the picketing.

Multiple legal actions arose from the activities of OPEU and the county during the bargaining impasse. Among the actions brought was a civil action by the individual commissioners against the union, in which they alleged tortious intentional interferences with economic relations. A trial court initially enjoined the union from further picketing on the ground that the picketing violated ORS 243.672(2)(g) and constituted unfair labor practices. OPEU appealed from the trial court's ruling, and the Supreme Court reversed, holding that the trial court did not have subject matter jurisdiction over the matter because an initial determination was required by the Board as to whether an unfair labor practice had occurred. *Ahern v. OPEU*, 329 Or 428, 988 P2d 364 (1999).

In another action, the county filed a claim with the Board alleging that the union had violated the rights of a county employee by having a union official confront her and try to coerce her into striking. In that case, the Board held that, while the individual public employee who was confronted by the union staff member might have had standing to bring an unfair labor practices claim, the county did not. *Jefferson County v. OPEU*, 18 PECBR 285 (1999).[2]

Meanwhile, the county filed the unfair labor practices claim that is the subject of this review. The county alleged, in part, that:

_____

[2] In resolving that case, the Board said:

"Here, the County neither alleged nor proved that it had suffered any direct and substantial injury from OPEU's conduct. The complaint alleges only that Watson was injured. And in contrast to the *Oregon City [Fed. of Teachers v. OCEA*, 36 Or App 27, 584 P2d 303 (1978)] case, there were no named individual complainants here for the County to be representing. We conclude that the county is not an 'injured party' within the meaning of ORS 243.672(3) with respect to this claim, and thus did not have standing to file the (2)(a) complaint." 18 PECBR at 291.

"7.  On February 15, 1999, Union pickets were present on the premises of Ahern Grocery and Deli in Madras, Oregon handing out leaflets * * * that contained information and opinions regarding the current on-going negotiations between the County and the Union.

"* * * * *

"9.  The leaflets distributed by the Union disparaged Mike Ahern for not being part of the County's bargaining team, and called on the public to demand that Mike Ahern 'carry out his elected responsibilities' and 'come to the bargaining table.'

"* * * * *

"12.  The objective of the Union's picketing of both Ahern Grocery and Deli, as well as the businesses of the other County Commissioners, was and continues to be to induce members of the public to cease doing business at the County Commissioner's businesses, and to refrain from buying goods or services from those businesses.

"13.  The effect of the Union's picketing at Ahern Grocery and Deli, as well as the places of business of the other County Commissioners, was and is to induce members of the public to cease doing business at the County Commissioner's businesses, and to refrain from buying goods or services from those businesses.

"14.  Inasmuch as both the objective and the effect of the Union's picketing the place of business of the County's governing members was and is to induce others to cease doing business with the governing body members' businesses or to cease dealing in goods or services produced at the governing body members' businesses, the Union's actions were and are in violation of ORS 243.676(2)(g).

"15.  By the statements made on the Union leaflets calling on Mike Ahern to make concessions in bargaining and be present at negotiation sessions, the Union interfered with the County's determination as to who will represent it in bargaining, in violation of ORS 243.672(2)(b)."

In the claim, the county seeks a determination by the Board that the union's picketing activity violated ORS

243.672(2)(b), which prohibits a union from refusing to bargain in good faith with a public employer, and ORS 243.672(2)(g), which prohibits certain types of picketing at private residences and businesses owned by individual members of a public employer. A hearing officer conducted a hearing and took testimony on the matters. In the hearing, the county argued that it was injured directly by the picketing because the picketing put economic pressure on the commissioners and "that economic pressure would then translate into a change in their position in this other area of county commission work."

As an alternative kind of injury, the county argued that it would have difficulty attracting and retaining qualified commissioners in the future because of the picketing. In support of that allegation of injury, the county presented testimony by commissioner Ahern, who testified that he considered resigning because of the picketing. The county also offered evidence that the union did not picket sites in town where there was more traffic. Thus, it argued that the picketing was not informational in nature but was intended to put pressure on the individual commissioners.

The hearing officer issued proposed findings of fact to which the parties filed objections.[3] The hearing officer found that the picketing had occurred and that the union had picketed generally to inform the community of the basis of the labor-management dispute but that at least one union steward had picketed for the purpose of gaining concessions from the commissioners. The hearing officer found further that the picket signs had contained messages such as, *"Mike Ahern Come to the Table,"* and *"Shop Ahern's But Tell Mike to Settle."* The hearing officer also found that the leaflets contained messages urging the commissioners to become directly involved in the bargaining process and to take stands more favorable to the union. The hearing officer found credible the testimony of one of the commissioners, who testified that when she closed her business due to the picketing, one of

---

[3] It appears that the hearing officer heard multiple matters between the parties on the same day and that the findings of fact submitted to the Board by the hearing officer were segregated by the hearing officer corresponding to the statutes alleged to have been violated.

the picketers said, "Good, it worked." The hearing officer's written findings were then submitted to the Board along with the parties' objections and post-hearing briefs. Up to that point, no one had raised the issue of the county's standing to bring an unfair labor claim on those grounds.

Nonetheless, the Board ruled *sua sponte* that the county had standing to pursue the ORS 243.672(2)(a) refusal-to-bargain complaint but that it did not have standing to bring the picketing claim under ORS 243.672(2)(g). It ultimately decided the merits of the refusal-to-bargain part of the claim adversely to the county. As to the claim under subsection (2)(g), the Board's opinion states, in part:

> "THE COUNTY IS NOT AN 'INJURED PARTY' AND DOES NOT HAVE STANDING TO BRING AN UNFAIR LABOR PRACTICE COMPLAINT ALLEGING UNLAWFUL PICKETING OF PRIVATE BUSINESSES.
>
> "* * * * *
>
> "For the reasons explained below, we do not reach the merits of the dispute concerning ORS 243.672(2)(g) because we conclude that the County does not have standing to bring this complaint, and we conclude that OPEU's efforts to get Ahern and other commissioners to participate in the bargaining process did not violate ORS 243.672(2)(b).
>
> "* * * * *
>
> "Under ORS 243.672(3), an 'injured party' may file a complaint with this Board alleging that an unfair labor practice has occurred. We have previously concluded that the County did not have standing to claim a violation of (2)(a), concerning alleged interference or coercion by OPEU with a *bargaining member's* rights, because the County could not show that it had suffered any harm as a result of OPEU's actions.
>
> "In reaching that conclusion, we quoted an Oregon Court of Appeals decision, *Oregon City Federation of Teachers v. Oregon City Education Association*, 36 Or App 27, 584 P2d 303 (1978), on what a complaining party must show to have standing: 'The petitioner must show that he has suffered or will suffer a substantial injury as a consequence of the alleged unfair labor practice.' Id at 32-33. To establish standing, a complaint must show that it has suffered

some actual or threatened injury as a result of the complained-of conduct. The County did not meet that burden in the earlier case and it has not met it here.

"ORS 243.672(2)(g) protects certain public officials from picketing at their businesses or residences. *In a (2)(g) case, a complainant must allege (and prove) that he or she is a member of the governing body of a public employer*, that the respondent is or has picketed or threatened to picket the official's residence or business, that the picketing concerns a contract or negotiations dispute, and that an objective or effect of the picketing is to interfere with the official's business.

"The unfair labor practice alleged is the picketing of County commissioners' businesses. The County did not show that it suffered or would suffer any substantial injury as a result of that picketing. The complaint alleges that the picketing caused harm to the *commissioners and their businesses*, not to the County. *Section (2)(g) protects the members of the public employer's governing body, not the public employer itself.*

"Ahern and the other commissioners may have had standing to pursue this charge as individuals who could claim harm from the picketing. However, under the circumstances, we conclude that the County is not an injured party within the meaning of the Public Employee Collective Bargaining Act (PECBA) and had no standing to bring this complaint. This element of the complaint will be dismissed." (First emphasis in original, second emphasis added; citations omitted.)

The county seeks review of the board's ruling on its standing and of the dismissal of only its ORS 243.672(2)(g) claim. It relies on *Oregon City Fed. of Teachers*, 36 Or App at 32, in which we said:

"An unfair labor practice complaint may be brought by an 'injured party.' The type of injury which must be pleaded and proved in order to establish standing to bring such a complaint is essentially the same as is required of litigants in other contests. The petitioner must be able to show that he has suffered or will suffer a substantial injury as a consequence of the alleged unfair labor practice." (Citation and footnote omitted.)

The county concludes that it is an "injured party" under our interpretation of the statute because it has suffered a substantial injury as the result of the economic pressure on the commissioners to bargain against its interests and the effect of the picketing on its ability to attract other qualified citizens to serve as county commissioners.[4]

OPEU counters:

"The statute narrowly prohibits conduct which is intended to and does injure the individual business of a county commissioner. This section is derived from, and in some ways similar in language to Section (8)(b)(4) of the National Labor Relations Act, 28 U.S.C. 158(b)(4), which forbids secondary boycotts in private employment. As in the private sector, Section (2)(g) prohibits a narrow category of conduct—picketing an individual—with a narrow end—boycotting his business.

"In secondary boycott cases, the harm is not to the primary employer, but to the secondary. The same is true here. The County is not a proper complainant, because it cannot state a cause of action under section (2)(g). It is not a member of a governing body; it has no 'business' to be damaged by unlawful secondary picketing. Even if the County were in some way affected by the picketing in question—and the record shows otherwise—it cannot be an 'injured party' since it cannot be a proper complainant."

Alternatively, the union argues that the county has not demonstrated any actual or threatened substantial injury. Finally, it asserts that the statute is unconstitutional under Article I, section 8, and Article I, section 26, of the Oregon Constitution, and under the First and Fourteenth Amendments to the United States Constitution.

■■■ The parties' arguments initially frame an issue of statutory interpretation. Our goal in interpreting a statute is to ascertain the legislature's intent, and we begin by an analysis of the text and context of the statute. If the intent of the legislature is not apparent from the text and context or if

---

[4] ORS 243.672(3) provides, in part, that "[a]n *injured party* may file a written complaint with the Employment Relations Board not later than 180 days following the occurrence of an unfair labor practice."

the statute is susceptible to more than one reasonable interpretation, we turn to the legislative history surrounding the statute's enactment. Where, as here, an administrative agency has interpreted a statute, we examine its interpretation "to ascertain whether it 'coincides with the legislative policy which inheres in the meaning of the statute.'" *Citizens Utility Board v. PUC*, 154 Or App 702, 714-15, 962 P2d 755 (1998), *rev allowed* 328 Or 464 (1999) (citation omitted); *see also Springfield Educ. Ass'n v. School Dist.*, 290 Or 217, 228, 621 P2d 547 (1980) ("The issue of law on review is whether the agency interpretation coincides with the legislative policy which inheres in the meaning of the statute.").

■    ORS 243.672(3) requires that a complainant in an unfair labor practices claim be an "injured party." There is no question that a county can be a party to such a claim under ORS 243.672. The text of ORS 243.676 provides that a public employer is a "person" or party who can participate in the processing of an unfair labor practice complaint. Subsections (1) through (4) of ORS 243.676 set out the processing procedure for such complaints and authorize the Board to award civil penalties to any "person" as a result of an unfair labor practice. ORS 243.676(5) provides that, "[a]s used in subsections (1) to (4) of this section, 'person' includes but is not limited to individuals, labor organizations, associations and public employers."

The remaining question is whether the county claims an injury for which the legislature contemplated redress under ORS 243.672(2)(g). As we implied in *Oregon City Fed. of Teachers*, the word "injured" in ORS 243.672 refers to the common understanding of what constitutes an "injured" litigant in other controversies. Similarly, the Supreme Court said in *Ahern* that "[t]o achieve the goals of PECBA, ORS 243.672(3) provides that 'an injured party'—that is, *anyone* who has been injured by an unfair labor practice—may file a complaint with ERB." *Ahern*, 329 Or at 434. (Emphasis in original.)

Here, there is no question that the county claims that it has been injured in a substantial way. The union's picketing of the individual commissioners is the kind of secondary picketing that *could* interfere with the operation of

the county's business and its ability to attract qualified people to serve as its commissioners. For purposes of the issue of standing, that leaves the union's contention that in enacting section (g) the legislature was concerned only with protecting commissioners from harm to their private businesses. Thus, according to the union, the county has no remedy under the statute even if the facts alleged are found to exist. The county counters that the statute contemplates more than standing for individual governing members of a public body and that, so long as the injury alleged is substantial, there is standing. Because the statute does not expressly define who has standing under it to bring a claim beyond the requirement that the complainant be an "injured party" who has suffered a substantial injury, either interpretation is reasonable, and we turn to additional evidence as to the scope of the statute.

ORS 243.672(2)(g) was added to the PECBA in 1995.[5] Before that time, the PECBA did not contain limitations on secondary picketing or boycotts, but it did contain a restriction on direct and indirect communications between public officials other than those designated to represent the employer regarding employment relations and union bargaining team members, except for matters relating to work performance. *Former* ORS 243.672(2)(f), amended by Or Laws 1995, ch 286, § 2(f). In 1995, Senators Gene Derfler and Neil Bryant introduced Senate Bill 750 (SB 750), which sought to repeal *former* ORS 243.672(2)(f). As originally proposed, the bill did not contain any limitations on secondary picketing or boycotts.

During the legislative session in March 1995, school board members testified before the Senate Labor and Government Operations Committee about their experience with secondary picketing and boycotts. For example, Mike Keown, Superintendent of the Oakridge School District, testified that his school district's ability to bargain effectively had been hampered because school board members were quitting before the end of their terms when their personal businesses were picketed. According to Keown, the school board itself was unable to bargain effectively because it was unable to retain more experienced board members as the result of the

---

[5] *See* Or Laws 1995, ch 286, § 2.

picketing. Tape recording, Senate Committee on Labor and Government Operations, SB 750, March 6, 1995, Tape 67, Side I (statement of Mike Keown). Other school district representatives testified similarly.

On March 10, 1995, Mike Tedesco, General Counsel for the Oregon School Employees Association, testified before the same committee on the proposed legislation to eliminate the restriction on communication. The following dialogue occurred:

"DERFLER: And then, I also, when you talk about the negotiations, it sounds like it all works very smoothly and fine for school boards - all they have to do is say 'no.' But in fact we've had school board members come in and testify to the frustration they go through, the intimidation they go through, because they have a business in the community and those businesses are boycotted, they're picketed, and those kinds of things happen on the [management] side too.

"TEDESCO: I don't doubt that, but please understand - the people in the collective bargaining process take on certain responsibilities and we're all supposed to play by what the rules are, and the rules, if they're followed fairly, those situations don't happen. I can tell you that, in terms of dealing with the OSEA, we have never had a situation where anyone has ever come to me or the executive directors of the organization I've worked under and said, 'You people are being unfair to our school board members.' I'm not aware of any situation like that. You know, you may have specific instances and gripes, but again it's a situation of throwing the baby out with the bath water.

"DERFLER: I wish you could have been here to hear some of the testimony we've heard from school board members.

"BRYANT: A couple of points I need to make. The passage of SB 750 in its present form will do nothing to stop the kind of testimony we've heard with regard to intimidation or demonstrations or boycotts. I would suggest to you that the passage of SB 750 will intensify those kinds of things." Tape recording, Senate Committee on Labor and Government Operations, SB 750, March 10, 1995, Tape 81, Side 1.

The bill passed the Senate and the House without the addition of any secondary picketing and boycott prohibitions and was referred to a conference committee. During the

committee's deliberations, the sponsors negotiated with the governor's office over several amendments and additions to the bill that had not appeared in the prior versions.[6] As a result of the negotiations, ORS 243.672(2)(g) was added to the bill. In describing the amendments to the conference committee, Bryant explained:

> "The next significant change is on page nine, which is new language dealing with the unconventional strike activity, not protected for private sector employees. This was taken out of the [National Labor Relations Act]. You'll note that the governor and other state-wide elected officials are excluded. Um, and of course, it has the free speech and assembly protection that's provided by the Oregon and the US Constitutions." Tape recording, Conference Committee on SB 750, June 1, 1995, Tape 2, Side 1.

Derfler then asked Bryant if the additional language tracked the language of the National Labor Relations Act (NLRA), and Bryant said that it did. *Id.* Ultimately, SB 750, with the secondary picketing prohibition included, was enacted as Or Laws 1995, chapter 286, section 2.

■       29 USC § 158(b), which is Section 8(b) of the NLRA, sets out a list of activities that constitute unfair labor practices for a labor organization or its agents that is similar to the list of unfair labor practices in ORS 243.672(2).[7] The limitations on secondary picketing are included in section 158(b)(4). In substance, those provisions provide that it is an unfair labor practice for a labor union to engage in secondary picketing or boycotts. Unlike PECBA, the federal statute creates a private right of action for parties who have been injured by another party's violation of the picketing and unconventional strike provisions. 29 USC § 187(b).[8] Such an

---

[6] The process used to achieve consensus on SB 750 is documented in Henry Drummonds, *A Case Study of the Ex Ante Veto Negotiations Process: The Derfler-Bryant Act and the 1995 Amendments to the Oregon Public Employee Collective Bargaining Law*, 32 Will L Rev 69 (1996).

[7] For example, Section 158(b)(1) corresponds with ORS 243.672(2)(a), and prohibits an employer from restraining employees in the exercise of collective bargaining rights; Section 158(b)(3) corresponds with ORS 243.672(2)(b), and requires an employer to bargain collectively in good faith.

[8] 29 USC § 187 provides:

> "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any

action, commonly known as a "303(b)" action, can be brought in district court simultaneously with an unfair labor practices claim. *See Longshoremen's Union v. Juneau Spruce Corp.*, 342 US 237, 72 S Ct 235, 96 L Ed 275 (1952).

In *Charvet v. Intern. Longshoremen's Assn., AFL-CIO*, 736 F2d 1572, 1576 (DC Cir 1984), the court said of the NLRA's provisions regarding secondary activity:

"It is generally understood that an action under section 303(b) may be brought not only by a neutral or secondary employer, but by the primary employer as well. Primary employers have standing to sue under section 303(b) because they are the *direct objects of the union's unlawful activity*. Harm to the primary is therefore not only foreseeable, but intentional." (Emphasis added.)[9]

After our review of the text and context of ORS 243.672(2)(g) and the legislative history underlying it, we conclude that the legislature contemplated that unfair labor practices claims such as the county has brought in this case are cognizable under the statute. On its face, the statute does not prevent the county from bringing its claim. We think that the harm that the legislature was concerned about when it prohibited secondary picketing under the statute includes any harm caused to the primary employer (in this case, the county rather than school districts). Under the Supreme Court's holding in *Ahern*, the exclusive determination of whether an unfair labor practice occurred lies with the Board, and the legislature has expressed its intent that the statute parallel the NLRA. Under the circumstances, the county has standing to bring a claim so long as it can demonstrate that it has suffered a substantial injury. We also agree with the county that it has alleged a substantial injury.

---

activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefore in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

[9] In contrast to the NLRA, the PECBA gives the Board exclusive jurisdiction to determine whether an unfair labor practice has been committed and requires an injured party first to file a complaint with the Board. *Ahern*, 329 Or at 436.

Thus, the Board erred when it ruled that the county had no standing under the statute. The Board did not reach the merits of the county's claim as the result of its ruling on the issue of standing. Therefore, we do not decide that issue, nor do we decide the issue of the constitutionality of the statute. The resolution of those issues must be first decided by the Board on remand.

Reversed and remanded.