Argued and submitted August 13, 2015; reversed and remanded on appeal, cross-appeal dismissed as moot December 29, 2016

WARRENTON FIBER COMPANY,
*Petitioner-Respondent*
*Cross-Appellant,*

*v.*

DEPARTMENT OF ENERGY,
*Respondent-Appellant*
*Cross-Respondent.*

Clatsop County Circuit Court
122419; A155371

388 P3d 372

Jona J. Maukonen, Assistant Attorney General, argued the cause for appellant-cross-respondent. With her on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

John M. Nygaard argued the cause and filed the briefs for respondent-cross-appellant.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

**FLYNN, J.**

This case arises out of a decision by the Oregon Department of Energy (ODOE)'s decision that Warrenton Fiber is not eligible for a biomass tax credit for tree bark that it stripped from pulp logs at its mill and then sold as "hog fuel."[1] Warrenton sought review of that decision in the circuit court, which concluded that ODOE relied on an invalid rule in rejecting Warrenton's application for a tax credit certification. ODOE challenges that determination, contending that it had authority to enact the challenged rule, which excluded from the definition of biomass "[s]awdust or other residual wood waste from mill operations." OAR 330-170-0040(1)(c) (Nov 2, 2010).[2] We conclude that the rule is valid and, thus, reverse and remand the trial court's grant of summary judgment to Warrenton and denial of summary judgment to ODOE. In light of that conclusion, we dismiss as moot Warrenton's cross-appeal, which assigns error to the denial of Warrenton's petition for attorney fees under ORS 183.497(1)—a provision that applies only "if the court finds in favor of the petitioner."

## I. BACKGROUND

We begin by explaining the statutory context out of which the parties' dispute arises. Under Oregon's biomass tax credit program, an "agricultural producer" or "biomass collector" is allowed a tax credit for the "production" or "collection" of "biomass in Oregon that is used, in Oregon, as biofuel or to produce biofuel." ORS 315.141(3)(a). The legislature has charged the ODOE with the task of establishing procedures and criteria for determining the amount of the credit, and with providing "written certification to taxpayers that are eligible to claim the credit[.]" ORS 315.141(5)(a). As pertinent to this appeal, the legislature has defined "biomass," as

---

[1] The parties agree that "hog fuel" generally describes woody residue, such as wood chunks and bark processed through a wood chipper or grinder into a mix normally used as fuel by burning it to produce bioenergy.

[2] ODOE amended OAR 330-170-0040(1) effective January 1, 2014, but Warrenton's application for a 2011 tax year credit is governed by the rules in effect for that tax year. All citations to OAR 330-170-0040(1) are to the version of the rule that was in effect November 2, 2010, unless otherwise noted.

"organic matter that is available on a renewable or recurring basis and that is derived from:

"(A) Forest or rangeland woody debris from harvesting or thinning conducted to improve forest or rangeland ecological health and reduce uncharacteristic stand replacing wildfire risk[.]"

ORS 315.141(1)(d). At the time that Warrenton sought the disputed certification, OAR 330-170-0040(1) provided, as pertinent:

"For the purposes of these rules biomass does not include:

"* * * * *

"(c) Sawdust or other residual wood waste from mill operations[.]"

Warrenton purchased pulp logs, which it hauled to its facility, stripped off the bark, and turned the remaining portion of logs into wood chips. Warrenton sold some of the stripped bark as "hog fuel" and sought a biomass tax credit certification from ODOE for $97,690.70 against the taxes due for its sale of the hog fuel. ODOE denied the application on the basis of OAR 330-170-0040(1)(c). Warrenton sought review in the circuit court pursuant to ORS 183.484, which provides for judicial review of an order in other than a contested case. Warrenton alleged that ODOE improperly denied the application because OAR 330-170-0040(1)(c), was invalid or, alternatively, because ODOE misinterpreted the rule when it applied it to Warrenton's application. The parties filed cross motions for summary judgment, and the trial court agreed with Warrenton's claim that the rule is invalid.[3] As to that claim, the court granted Warrenton's motion for summary judgment and denied ODOE's motion. The court remanded to ODOE for a determination of whether Warrenton's application met the other requirements for the biomass tax credit. On appeal, ODOE assigns error both to the denial of its motion for summary judgment and to the granting of Warrenton's motion on the claim that the rule is invalid.

---

[3] ORS 183.400(2) provides, in part, that a court may determine "the validity of any applicable rule" in the course of reviewing an order.

## II.  DISCUSSION

In reviewing an agency order, the court is authorized by ORS 183.400(4) to declare the rule invalid only if the court determines that the rule "violates constitutional provisions, exceeds the statutory authority of the agency that adopted the rule, or was adopted without complying with rulemaking procedures." *Assn. of Acupuncture v. Bd. of Chiropractic Examiners*, 260 Or App 676, 678, 320 P3d 575 (2014). Here, Warrenton does not contend that the rule is unconstitutional or that ODOE adopted the rule without complying with rulemaking procedures, so we consider whether the rule exceeds ODOE's statutory authority. In this context, our review of the rule's validity is limited to "the wording of the rule itself (read in context) and the statutory provisions authorizing the rule." *Wolf v. Oregon Lottery Commission*, 344 Or 345, 355, 182 P3d 180 (2008).

There is no dispute that ODOE is generally authorized to "[a]dopt rules and issue orders to carry out the duties of the director and the State Department of Energy," and those duties specifically include certifying biomass tax credits. ORS 469.040(1)(d); *see also* ORS 315.141 (designating ODOE responsibility for biomass tax credits and certification). Warrenton argues, however, and the trial court agreed, that the rule exceeds ODOE's authority because it excludes from the definition of "biomass" material to which the legislature intended to extend the tax credit. We disagree.[4]

The parties' dispute primarily turns on whether the rule is consistent with ORS 315.141(1)(d)(A), which—as quoted above—defines "biomass" to include:

"organic matter that is available on a renewable or recurring basis and that is derived from:

"(A)  Forest or rangeland woody debris from harvesting or thinning conducted to improve forest or rangeland

---

[4] Given our conclusion that the rule is a valid exercise of ODOE's general rulemaking authority, we do not reach that agency's alternative argument that the rule is authorized by the specific authority with which ODOE has been tasked to "adopt rules to define criteria, only as the criteria apply to organic biomass, to determine additional characteristics of biomass." ORS 315.141(2).

ecological health and reduce uncharacteristic stand replacing wildfire risk[.]"[5]

As construed by ODOE, that definition is consistent with OAR 330-170-0040(1)(c) because the statute identifies woody debris biomass according to the direct source of the debris, and "residual wood waste from mill operations" describes a different source than "[f]orest or rangeland woody debris from harvesting or thinning." Warrenton urges us to construe the statutory definition as reaching woody residue created from mill operations if the trees used in those mill operations originally came "from harvesting or thinning conducted to improve forest or rangeland ecological health and reduce uncharacteristic stand replacing wildfire risk."

A. *Standard of Review—Exact, Inexact and Delegative Terms*

When an agency's construction of a statute is at issue, our standard of review depends upon whether the phrase at issue is an exact term, an inexact term, or a delegative term. *Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 353, 15 P3d 29 (2000) (citing *Springfield Education Assn v. School Dist.*, 290 Or 217, 223, 621 P2d 547 (1980)). Exact terms "impart relatively precise meaning," for example, "21 years of age, male, 30 days[.]" *Springfield Education Assn*, 290 Or at 223. Inexact terms are less precise but still "embody a complete expression of legislative meaning." *Coast Security Mortgage Corp.*, 331 Or at 354. The court reviews the agency's construction of inexact terms "for consistency with legislative intent." *Id.* Finally, delegative terms "express incomplete legislative meaning" and leave to the agency the task of completing "the general legislative policy decision." *Id.* The Supreme Court has cited terms such as "good cause," "fair," "undue," and "unreasonable" as examples of "delegative terms." *Springfield Education Assn*, 290 Or at 228. Only when the legislature has used a delegative term does the court defer to the agency's determination of the legislature's intent. *Id.* at 229.

---

[5] Although ORS 315.141(1)(d) identifies other categories of biomass, the parties agree that (A) is the only category that could conflict with OAR 330-170-0040(1)(c).

ODOE contends that the phrase at issue—"[f]orest or rangeland woody debris from harvesting or thinning"—is a delegative term, but we conclude that it is an inexact term. The term at issue is "inexact" because it reflects the legislature's intent to define the organic material that is "biomass." It is not simply a general policy decision regarding biomass, but it is susceptible to competing interpretations. *See Coast Security Mortgage Corp.*, 331 Or at 354 (concluding that the phrase at issue was "an 'inexact term' because, although parts of that phrase are defined by statute and embody a complete expression of legislative meaning, the phrase is open to various interpretations.").

B. *Statutory Construction*

As indicated above, the question for the court when reviewing an agency's construction of inexact statutory terms is whether that construction is consistent with the legislature's intent. *Coast Security Mortgage Corp.*, 331 Or at 354. Determining the meaning of the statute is a question of law, ultimately for the court. *Springfield Education Assn*, 290 Or at 224. As with other questions of statutory construction, in determining the scope of an agency's statutory authority, "we seek to discern the legislature's intent by examining the text and context of the relevant statutes and, if useful to the analysis, pertinent legislative history." *Assn. of Acupuncture*, 260 Or App at 678 (citing *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)). Here, the text and context of ORS 315.141(1)(d)(A) lead us to conclude that the legislature intended to make the biomass tax credit available when woody debris is removed from the forest *as debris* and sold for biofuel.

1. *Textual analysis of ORS 315.141(1)(d)(A)*

First, we agree with ODOE that the text— "[f]orest or rangeland woody debris from harvesting or thinning"—suggests a legislative intent to identify woody biomass according to the method by, and location at which, the debris is created. Rather than extend the definition of biomass to all woody debris, the legislature limited the category according to the location of the debris—"[f]orest or rangeland"—and the process by which the debris is created—"from harvesting or thinning." The legislature did

not define the term "debris," and it is not a legal or technical term, so we look to the plain and ordinary meaning of the term. *See State v. Dickerson*, 356 Or 822, 829, 343 P3d 447 (2015) ("When the legislature does not provide a definition of a statutory term, we ordinarily look to the plain meaning of the statute's text to determine what particular terms mean."). The ordinary meaning of "debris" is "the remains of something broken down or destroyed." *Webster's Third New Int'l Dictionary* 582 (unabridged ed 1993). The qualification that this woody debris (or remains) must be "forest or rangeland" debris suggests that the location of the debris must be a forest or rangeland. And the further qualification that the remains must be "from harvesting or thinning" suggests a direct connection to those activities. *See Webster's* at 913 (as pertinent, defining "from" as "a function word" used "to indicate the source or original or moving force of something"). Thus, the text suggests a legislative intent to allow a biomass tax credit for woody remains that are located in the forest or rangeland and directly related to a harvesting or thinning operation.

### 2. *Statutory context*

That construction is also suggested by the context, which can include other provisions of the bill originally approved by the legislature, although codified in different chapters or sections of the Oregon Revised Statutes. *See, e.g., State v. Ortiz*, 202 Or App 695, 699-700, 124 P3d 611 (2005) (considering other provisions of the "same mammoth" legislation that produced the statute at issue). When the legislature adopted the biomass tax credit, it also specified the credit rates for each type of biomass. Or Laws 2007, ch 739, § 5. That provision described the credit for "woody biomass" in terms of the location from which the biomass is collected:

> "For woody biomass *collected from* nursery, orchard, agricultural, forest or rangeland property in Oregon, including but not limited to prunings, thinning, plantation rotations, log landing or slash resulting from harvest or forest health stewardship, $10.00 per green ton."

Or Laws 2007, ch 739, § 5 (*Former* ORS 469.790 (2007); *renumbered as* ORS 469B.403(6) (2011)) (emphasis added). None of the other tax credit rates would cover wood waste

collected from a mill. *See* ORS 469B.403.[6] The legislature's description of the woody biomass credit rate with reference to the location from which it has been collected, in combination with the text of ORS 315.141(1)(d)(A) persuades us that the legislature intended "forest or rangeland woody debris" to mean debris collected, as debris, from the forest or rangeland.

Warrenton argues that extending the tax credit to mill waste would be consistent with a general statement of legislative policy, adopted in 2005, which encourages the Department of Forestry to promote biofuel in conjunction with forest health. *See* ORS 526.277(3) (2005), *amended by* Or Laws 2011, ch 276, § 4 ("The development of biomass markets, including energy markets, that use forest biomass unsuitable for lumber, pulp and paper products as a primary source of raw material may assist in the creation of a sustainable, market-based model for restoring complexity and structure to Oregon's forests."). Warrenton may be correct that a broader range of woody biomass would be consistent with the general policy described in ORS 526.277, but that does not persuade us that the 2007 legislature intended a meaning for ORS 315.141(1)(d)(A) other than what the text

---

[6] HB 2210 specified tax credit rates for biomass:

"(1) For oil seed crops, $0.05 per pound.

"(2) For grain crops, including but not limited to wheat, barley, and triticale, $0.90 per bushel.

"(3) For virgin oil or alcohol delivered for production in Oregon from Oregon-based feedstock, $0.10 per gallon.

"(4) For used cooking oil or waste grease, $0.10 per gallon.

"(5) For wastewater biosolids, $10.00 per wet ton.

"(6) For woody biomass collected from nursery, orchard, agricultural, forest or rangeland property in Oregon, including but not limited to prunings, thinning, plantation rotations, log landing or slash resulting from harvest or forest health stewardship, $10.00 per green ton.

"(7) For grass, wheat, straw or other vegetative biomass from agricultural crops, $10.00 per green ton.

"(8) For yard debris and municipally generated food waste, $5.00 per wet ton.

"(9) For animal manure or rendering offal, $5.00 per wet ton."

Or Laws 2007, ch 739, § 5.

and closely related statutory context suggest.[7] *See Burke v. DLCD*, 352 Or 428, 441, 290 P3d 790 (2012) ("[A] statement of legislative findings, without more, is a slim reed on which to rest an argument that the operative provisions of a statute should be taken to mean something other than what they appear to suggest.").

### 3. *Legislative history*

Neither party has identified legislative history that resolves the narrow question of statutory construction at issue in this case, and we have found none. However, the limited history regarding the language of ORS 315.141 (1)(d)(A) is consistent with the construction we have identified. ORS 315.141 was enacted in 2007 as part of House Bill (HB) 2210, a comprehensive biofuel bill. Or Laws 2007, ch 739, § 5. As originally drafted, the definition of "biomass" in HB 2210 included "organic matter * * * that is derived from wood, forest, or field residues," a definition that might have reached wood waste from mill operations. Bill File, HB 2210, Nov 30, 2006 (initial draft). The ultimate language used in ORS 315.141(1)(d)(A) is the product of amendments added by the House Energy and the Environmental Committee. Minutes, House Energy and Environment Committee, HB 2210, Feb 5, 2007, 1-2. While the bill was pending before the House Energy and the Environment Committee, the committee received written testimony from Ronald Suppah, Tribal Council Chair for the Confederated Tribes of the Warm Springs Reservation of Oregon, in support of the tax credit. Exhibit H, House Energy and Environment Committee, HB 2210, Jan 29, 2007 (accompanying statement of Tribal Council Chair Ronald Suppah). Suppah described the tribe's existing biomass operation, and emphasized that "a significant purpose of the biomass project is to improve forest health by providing a market for the small diameter biomass by-product from forest health projects." *Id.* However,

---

[7] For similar reasons, we are also unpersuaded by Warrenton's argument that the effect of ODOE's construction of the statute is to deny a tax credit for some woody debris simply because the logs were transported to a mill before being stripped of their bark. To the extent that Warrenton is correct about the effect of ODOE's statutory construction, Warrenton's concern is a policy matter that does not persuade us to construe the statute in a manner other than that suggested by the text and closely related statutory context.

he explained that "[f]orest health projects will typically be a more expensive source of biomass than urban wood or mill wood waste residuals because of transportation costs and because it involves intensive hand and mechanical treatments." *Id.* As a result, Suppah explained, "[i]f the Project were operated to maximize profit, the Project would use exclusively sawmill residuals and urban wood which would mean that there would not be any forest health benefits." *Id.* Thus, to allow projects "to operate profitably and at the same time maximize the forest health benefits," the Tribe recommended "market incentives in the form of tax credits, grants, green market credits which help to lower the overall cost of the Project." *Id.* We recognize that this legislative history represents the testimony of only one committee witness, but we highlight Suppah's testimony because it may explain why the legislature intended to extend the tax credit only to woody debris collected in the forests and rangelands.

## III. CONCLUSION

Thus, we conclude that the legislature intended the biomass category of "[f]orest or rangeland woody debris from harvesting or thinning" to mean organic material that is debris when collected from the forest or rangeland. That definition is consistent with the challenged rule, which categorizes "residual wood waste from mill operations" as not biomass.

Warrenton argues, however, that the rule has the effect of denying a tax credit for some biofuel from "[f]orest or rangeland woody debris" simply because the debris was transported to a mill before being converted to hog fuel. That possibility is beyond the scope of Warrenton's challenge to the validity of the rule. *See Wolf,* 344 Or at 355 (court's review of whether a rule exceeds the agency's statutory authority "is limited to the wording of the rule itself (read in context) and the statutory provisions authorizing the rule.") *See also Oregon Newspaper Publishers v. Dept. of Corrections,* 329 Or 115, 118-19, 988 P2d 359 (1999) (if "rules on their face comply with applicable constitutional and statutory requirements * * * any further challenge to them must be made on an 'as applied' basis"). We understand that Warrenton's petition for review in the circuit court also

alleged that ODOE misinterpreted OAR 330-170-0040(1)(c) (2009) when it applied it to Warrenton's application for a tax credit, but that issue is not before us on appeal. The only rulings assigned as error are the trial court's grant of summary judgment to Warrenton and denial of summary judgment to ODOE on the claim that the rule is invalid. Because we conclude that the rule is valid, we reverse.

Reversed and remanded on appeal; cross-appeal dismissed as moot.